**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| **General Synod of The United Church of Christ; Reverend Joseph Hoffman; Reverend Nancy Ellett Allison; Reverend Nathan King; Reverend Nancy Kraft; Rabbi Jonathan Freirich; Reverend Robin Tanner; Reverend Mark Ward; Reverend Dr. Nancy E. Petty; Kay Diane Ansley; Catherine "Cathy" McGaughey; Elizabeth "Lisa" Cloninger; Kathleen Smith; Shauna Bragan; Stacy Maloney; Cathy Fry; Joanne Marinaro; Joel Blady; Jeffrey Addy; Betty Mack; and Carol Taylor;** <br><br> Plaintiffs, <br><br> v. <br><br> **Roy Cooper, Attorney General of North Carolina; Drew Reisinger, Register of Deeds for Buncombe County; Wayne Nixon, Register of Deeds for Cabarrus County; Tonia Hampton, Register of Deeds for McDowell County; J. David Granberry, Register of Deeds for Mecklenburg County; Laura M. Riddick, Register of Deeds for Wake County; Ronald L. Moore, Buncombe County District Attorney; Roxann Vaneekhoven, Cabarrus County District Attorney; Bradley Greenway, McDowell County District Attorney; Andrew Murray, Mecklenburg County District Attorney; and Ned Mangum, Wake County District Attorney;** <br><br> Defendants. | Civ. No. _____ |

## COMPLAINT

## INTRODUCTION

1.      Marriage is a public affirmation of love and respect, and the freedom to marry confers upon individuals "a dignity and status of immense import." *United States v. Windsor*, 133 S.Ct. 2675, 2692 (2013).  A marriage embodies a mutual exchange of promises to support

and care for each other, and it fosters emotional, psychological, physical, financial, and spiritual well-being.  In short, as the Supreme Court has noted, marriage is "the most important relation in life."  *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978).

2.      When the government denies a group of people the right to marry without a rational reason for doing so, it imposes a severe "disadvantage, a separate status, and so a stigma" upon that group.  *Windsor*, 133 S.Ct. at 2693.  By denying same-sex couples the right to marry and by prohibiting religious denominations even from performing marriage ceremonies for same-sex couples, the State of North Carolina stigmatizes same-sex couples, as well as the religious institutions and clergy that believe in equal rights.

3.       Plaintiffs thus bring this action to challenge the constitutionality of, collectively, the "Marriage Laws" of the State, including Article XIV, Section 6 of the Constitution of North Carolina (so-called, "Amendment One"), North Carolina General Statutes §§ 51-1, 51-1.2, 51-6, 51-7, and all other North Carolina laws that define marriage as exclusively between opposite-sex couples and that preclude—through the imposition of criminal penalties and otherwise—religious ministers, clergy, or anyone else from performing a ceremony of marriage for same-sex couples, thereby preventing couples in those congregations from freely participating in such religious ceremonies.

4.      Plaintiffs to this suit fall into three categories:

a.  A religious denomination whose teachings embrace equal marriage rights for all persons regardless of sexual orientation and/or gender.  The denomination seeks to enjoin and declare unconstitutional all laws that criminalize and prohibit rites that recognize and bless the union of loving couples of the same sex—couples

2

who, if they were of the opposite sex, could have their union recognized and blessed. This is referred to as the "Religious Denomination Plaintiff."

b. The second set of plaintiffs consists of religious ministers and clergy whose faiths teach, and whose congregations affirm, that all loving couples, regardless of sexual orientation and gender, should be permitted to marry in their places of worship and who wish to marry such couples as part of their ministerial calling. These plaintiffs are referred to as the "Clergy Plaintiffs" or "Minister Plaintiffs." They ask this Court to enjoin and declare unconstitutional all laws that criminalize and prohibit ceremonies or rites that recognize and bless the marriage of loving couples of the same sex.

c. The third set of plaintiffs are same-sex couples—many of whom are members of the Plaintiff Denomination and congregants of the Clergy Plaintiffs—who wish to marry in North Carolina in their homes of worship and under their religious traditions and receive all of the spiritual, psychological, financial, social, and legal benefits the State provides to married heterosexual spouses. They also ask this Court to enjoin and declare unconstitutional all laws that criminalize and prohibit ceremonies or rites that recognize and bless the religious marriage of loving couples of the same sex. They further ask the Court to enjoin and declare unconstitutional the Marriage Laws of North Carolina as a denial of equal protection and a violation of substantive due process that implicates their fundamental right to marry. These plaintiffs are referred to as the "Couple Plaintiffs."

**JURISDICTION AND VENUE**

5.      This case raises questions under the Constitution of the United States and 42 U.S.C. § 1983, and, thus, this Court has jurisdiction over all claims for relief pursuant to 28 U.S.C. § 1331.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all defendants are residents of North Carolina and the majority of defendants reside in or have a substantial presence in the Western District of North Carolina.  Venue is also proper in this Court because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

7.      All actions complained of herein were taken under color of state law, and all Defendants are considered persons, for purposes of 42 U.S.C. § 1983, through which Plaintiffs bring these claims.

**THE PARTIES**

*The Denominational Plaintiff*

8.      The United Church of Christ ("UCC") is a Protestant religious denomination comprised of approximately 1.1 million members worshiping in over 5,100 Local Churches. The UCC was formed in 1957 by the union of the Evangelical and Reformed Church and the General Council of the Congregational Christian Churches of the United States in order to express more fully the oneness in Christ of the churches composing it, to make effective their common witness in Christ, and to serve God's people in the world. In North Carolina, there are over 24,000 UCC members and over 400 clergy authorized or affiliated with the United Church of Christ worshiping at approximately 155 Local Churches. The United Church of Christ is a church of extravagant welcome, proclaiming that no matter who you are and where you are on life's journey, you are welcome here. The United Church of Christ believes in a Still Speaking God,

and affirms the responsibility of the church in each generation to make the Christian faith its own in reality of worship, in honesty of thought and expression, and in purity of heart before God.

9.      Plaintiff **The General Synod of the United Church of Christ** ("General Synod") is the representative body of the UCC.  The General Synod is the gathering of a faith community representative of the wider church to listen for and discern the call of God to the UCC. Delegates from the UCC's 38 Conferences,  regional judicatory bodies, meet at the General Synod every two years to deliberate, discern, and identify the mission of the wider church in God's world and offer suggestions, invitations, challenges, and assistance in covenant with Local Churches and other settings as they engage in mission together.

10.      The UCC has a rich heritage of supporting equal rights for all of God's people and robust protection of their right freely to exercise their religious beliefs.  For more than 30 years, the General Synod of the UCC has adopted resolutions affirming lesbian, gay, bisexual, and transgender ("LGBT") persons; calling for an end to discrimination and for equal protection under the law; deploring LGBT hate crimes and violence; supporting LGBT relationships and families; celebrating the gifts of LGBT persons for ministry; and encouraging all settings of the church to be open and affirming of LGBT persons, welcoming them and encouraging their participation in every aspect of the mission and ministry of the church.

11.      In 1975, the tenth General Synod declared that "as a child of God, every person is endowed with worth and dignity that human judgment cannot set aside.  Denial and violation of the civil liberties of the individual and her or his right to equal protection under the law undermines that worth and dignity and is, therefore, morally wrong."  In 1977, the eleventh General Synod urged that U.S. States legislatively recognize that marriage between a man and a woman is "not the only stable living unit which is entitled to legal protection in regards to socio-

5

economic rights and responsibilities." In 1993, the nineteenth General Synod called on members of the church for greater leadership to end discrimination against gays and lesbians. And in 2005, the twenty-fifth General Synod affirmed equal marriage rights for couples regardless of sex. The resolution specifically opposed legislation that denies adult couples the right to marry based on gender.

12. In July of 1977, the General Synod adopted a resolution resulting in the development of a Book of Worship for the UCC, which is a resource of liturgies and orders of religious services and ceremonies for clergy. The Book of Worship also serves as an instrument in bringing members closer to the Holy One in whom we live and move and have our being.

13. As set forth in the UCC Book of Worship, the essence of marriage is a covenanted commitment that has its foundation in the faithfulness of God's love. The marriage ceremony is the glad occasion on which two people unite in the mutual exchange of covenant promises. The presiding clergy person acts as an official representative of the church and gives the marriage the church's blessing. The congregation joins in affirming the marriage and in offering support and thanksgiving for the new family.

14. After the General Synod's 2005 resolution affirming marriage equality, and as a result of that resolution, the order for a religious marriage ceremony appearing in the UCC's Book of Worship affirmed its support for "equal marriage rights for couples regardless of gender." As a result of the 2005 resolution, the UCC's Book of Worship was modified so that it could be performed for same-sex couples in UCC Local Churches and by UCC authorized ministers. Importantly, the order for a Holy Union or religious marriage ceremony in the liturgy of the UCC has since 2005 been identical for same-sex and different-sex couples.

6

*The Clergy Plaintiffs*

15.     Plaintiff **Reverend Joe Hoffman** is the Senior Minister of First Congregational United Church of Christ in Asheville, North Carolina, where he has served since 1996.  Rev. Hoffman received his undergraduate degree from the University of North Carolina in Asheville in 1981, his Master's Degree in Christian Education from Scarritt Graduate School in Nashville in 1984, and his Master's of Divinity from Candler School of Theology at Emory University in 1992.

16.     Plaintiff **Reverend Nancy Ellett Allison** is the Senior Pastor of Holy Covenant United Church of Christ in Charlotte, North Carolina, where she has served since 2004.  Rev. Allison earned her Bachelor of Arts degree from Baylor University in 1974 and her Ph.D. from Southwestern Baptist Theological Seminary in Fort Worth in 1986.

17.     Plaintiff **Reverend Nathan King** is the Senior Pastor of Trinity Reformed United Church of Christ in Concord, North Carolina, where he has served since 2001.  Rev. King earned his Bachelor of Science from Gardner-Webb College in 1984 and his Master of Divinity degree from Southeastern Baptist Theological Seminary in Wake Forest in 1990.  He was licensed for ministry in the Southern Baptist Church in the early 1980s.

18.     Plaintiff **Reverend Nancy Kraft** is pastor of Holy Trinity Lutheran Church in Charlotte, North Carolina, where she has served since 2005.  In 1974, Rev. Kraft graduated with a Bachelor of Science in Education from Bowling Green State University.  She received her Masters in Divinity from Trinity Lutheran Seminary in Columbus, Ohio in 1979 and later received her doctorate from the University of Pittsburgh in 1991.  In 1978, Rev. Kraft was certified for pastoral ministry in the Evangelical Lutheran Church in America and was ordained on March 11, 1979.

19.     Plaintiff **Rabbi Jonathan Freirich** is a congregational rabbi in Charlotte, North Carolina. In 1992, he graduated from Middlebury College in Vermont with a degree in Philosophy and History. In 1999, he graduated from the Reconstructionist Rabbinical College in Pennsylvania as an ordained rabbi. Rabbi Freirich is a longtime member of both the Central Conference of American Rabbis (CCAR) and the Reconstructionist Rabbinical Association (RRA), and has served congregations that are part of the Union for Reform Judaism (URJ).

20.     Plaintiff **Reverend Robin Tanner** is the Lead Minister of the Piedmont Unitarian Universalist Church in Charlotte, North Carolina, where she has served since 2010. She graduated from the University of Rochester after majoring in Religious Studies and Psychology. In 2009, Rev. Tanner subsequently completed her Masters of Divinity at Harvard. She was ordained as a Unitarian Universalist minister in 2009.

21.     Plaintiff **Reverend Mark Ward** is a minister at the Unitarian Universalist Congregation in Asheville, North Carolina, where he has served since 2005. He received his undergraduate degree in Philosophy from Earlham College in 1975, his Masters degree in Philosophy from Bryn Mawr College in 1976, and his Masters degree from the Columbia Graduate School of Journalism in 1979. He worked in journalism in Charleston, West Virginia from 1979 to 1984 and in Milwaukee, Wisconsin from 1984 until 2004. Near the end of his career in Milwaukee, Rev. Ward enrolled in Meadville Lombard Theological School of Chicago, Illinois, and earned his Masters of Divinity in 2004.

22.     Plaintiff **Reverend Dr. Nancy E. Petty** is pastor of Pullen Memorial Baptist Church in Raleigh, North Carolina, where she has served in different capacities since 1992. Rev. Petty received her undergraduate degree in Religion from Gardner-Webb College (now

University) in 1985, her Masters of Divinity from Southeastern Baptist Theological Seminary in 1988, and her Doctor of Ministry from McCormick Theological Seminary in 1997.

***The Couple Plaintiffs***

23.     Plaintiff **Kay Diane Ansley** resides in Old Fort, North Carolina.  She earned a Bachelor of Science degree from the University of West Georgia in 1983 and a degree from the American Institute for Paralegal Studies in 1993.  She previously worked in law enforcement for 22 years and now works for a local physician as a Patient Scheduler and Medical Records Custodian.  Diane is a member of First Congregational United Church of Christ in Asheville.

24.     Diane resides in Old Fort with her partner of 14 years, Plaintiff **Catherine "Cathy" McGaughey**.  In 1982, Cathy earned a Bachelor of Science degree from Georgia State University's College of Urban Life.  She currently works for a local physician as an Accounts Receivable Specialist and bookkeeper.  She also does bookkeeping for two faith-based non-profit groups in Asheville and Georgia and for a small retail firm in Asheville.  Cathy is on the Executive Board at First Congregational United Church of Christ in Asheville.

25.     If it were lawful to do so in North Carolina, Plaintiffs Ansley and McGaughey would seek to be married.

26.     Plaintiffs Ansley and McGaughey have applied for and been denied a marriage license.

27.     Plaintiffs Ansley and McGaughey would like to have Rev. Hoffman perform a Holy Union religious marriage ceremony at First Congregational United Church of Christ.

28.     Plaintiff **Elizabeth "Lisa" Cloninger** resides in Charlotte, North Carolina.  Lisa has earned a Bachelor of Arts degree in Child and Family Development from the University of North Carolina-Charlotte and a Master of Social Work degree from the University of North

9

Carolina-Chapel Hill. She is a unit supervisor with Mecklenburg County Children's Developmental Services and is also an adjunct instructor in the Early Childhood Education program at Central Piedmont Community College. Lisa is an Elder at Holy Covenant United Church of Christ in Charlotte and currently serves as the President of the church's Consistory.

29. For the past thirteen years Lisa has been the partner of Plaintiff **Kathleen Smith**. Kathleen received a Bachelor of Arts degree from Mars Hill University in 1975 and a Master of Education degree from Winthrop University in 1977. She has taught school and administered operations for a local arts education non-profit organization, as well as administering a major grant program at Central Piedmont Community College. She is currently on a contract assignment at Duke Energy through Business Control Systems. At Holy Covenant United Church of Christ, Kathleen has been a deacon and interim accompanist and has in the past chaired the Worship and Finance Committees. She currently leads the Communications Team.

30. If it were lawful to do so in North Carolina, Plaintiffs Cloninger and Smith would seek to be married.

31. Plaintiffs Cloninger and Smith have applied for and been denied a marriage license.

32. Plaintiffs Cloninger and Smith intend to have Rev. Allison perform a Holy Union religious marriage ceremony on October 3, 2014 at Holy Covenant United Church of Christ.

33. Plaintiff **Shauna Bragan** resides in Concord, North Carolina. Shauna received a Bachelor of Science degree in Biology in 2004 from Presbyterian College in Clinton, South Carolina. Shauna is a published environmental scientist and currently works as a Customer Service Agent for a business that provides customer care, customer retention, and revenue recovery services to a host of industries, including financial services, telecommunications and

government.  Shauna faithfully attends Trinity Reformed United Church of Christ in Concord, North Carolina.

34.     Shauna resides with her partner, Plaintiff **Stacy Maloney**.  Stacy earned her Bachelor of Science degree in 2004 in Physical Education.  For the past seven years Stacy has worked as the adaptive physical education teacher in Cabarrus County.  She has also taught a course on adapted sport at Wingate University.  In August 2013, Stacy opened a day program for adults with disabilities in Cabarrus County.  She also runs a summer program for students with disabilities in Cabarrus and surrounding counties.  Stacy is an active member of Trinity Reformed United Church of Christ in Concord.

35.     If it were lawful to do so in North Carolina, Plaintiffs Maloney and Bragan would seek to be married.

36.     Plaintiffs Maloney and Bragan have applied for and been denied a marriage license.

37.     Plaintiffs Maloney and Bragan would like to have a Holy Union religious marriage ceremony at Trinity Reformed United Church of Christ.

38.     Plaintiff **Cathy Fry** resides in Huntersville, North Carolina, with her partner, Joanne Marinaro.  Cathy graduated from Catawba College in 1980 with a degree in Psychology and from the University of North Carolina – Charlotte in 1988 with a Masters of Arts in Industrial/Organizational Psychology.  Cathy now owns and operates a small furniture company with her brother.  Cathy has been a member of Holy Trinity Lutheran Church for about 25 years.

39.     Since 1986, Cathy has been the partner of Plaintiff **Joanne Marinaro**.  Joanne graduated from the University of Central Florida in 1984 with a degree in Criminal Justice.  She

is a Senior Manager for a North Carolina based Property and Casualty Insurance Company. Joanne has been a member of Holy Trinity Lutheran Church for about 25 years.

40.     If it were lawful to do so in North Carolina, Plaintiffs Fry and Marinaro would seek to be married.

41.     Plaintiffs Fry and Marinaro have applied for and been denied a marriage license.

42.     Plaintiffs Fry and Marinaro would like to have a wedding ceremony at Holy Trinity Lutheran Church performed by Pastor Nancy Kraft.

43.     Plaintiff **Joel Blady** resides in Charlotte, North Carolina, with his partner, Jeffrey Addy.  Joel graduated from Mercer County Community College in 1984 with a certificate of proficiency in mortuary science.  In 1985, he received an Associate of Science degree from Mercer County Community College.  He has worked in the funeral industry for the past 32 years. Joel has been a member of Temple Beth El and Temple Israel in Charlotte, North Carolina since 2004.

44.     Plaintiff **Jeffrey Addy** resides in Charlotte, North Carolina, with his partner, Joel Blady.  Jeffrey received an Associate's Degree from Muskingum Technical College in Zanesville, Ohio in 2001.  He currently works in the healthcare industry in Charlotte.  Jeffrey began attending Temple Beth El in 2011 when he and Joel Blady first became a couple.

45.     If it were lawful to do so in North Carolina, Plaintiffs Blady and Addy would seek to be married.

46.     Plaintiffs Blady and Addy have not applied for a marriage license because it would be futile for them to do so.

47.     Plaintiffs Blady and Addy would like to have a wedding ceremony at Temple Beth El performed by Rabbi Jonathan Freirich.

48.     Plaintiff **Betty Mack** resides in Asheville, North Carolina.  Betty is in her 70s and is retired.  Betty is a member of the Unitarian Universalist Congregation in Asheville, North Carolina.

49.     Betty has been in a committed relationship with **Carol Taylor** for over 41 years. Carol, who is also in her 70s, is also retired.  Carol is also a member of the Unitarian Universalist Congregation in Asheville, North Carolina.

50.     If it were lawful to do so in North Carolina, Plaintiffs Mack and Taylor would seek to be married.

51.     Plaintiffs Mack and Taylor have applied for and been denied a marriage license.

52.     Plaintiffs Mack and Taylor would like to have a wedding ceremony at the Unitarian Universalist Congregation performed by Reverend Ward.

53.     Plaintiffs file this case not to compel other faiths to conform to their religious beliefs but to assert their right to freely perform religious services and ceremonies consistent with their beliefs and practices, and to extend the equal protection of the laws to all of God's children.

*Defendants*

54.     Defendant **Roy Cooper** is the Attorney General of North Carolina. In that capacity, it is his duty to appear for the State in any court or tribunal in any cause or matter, civil or criminal, in which the State may be a party or interested. N.C. Gen. Stat. § 114-2.  It is the duty of Defendant Cooper to defend and enforce the laws of North Carolina.

55.     Additionally, in that capacity, and among other relevant opinions, Defendant Cooper has advised that "a register of deeds would violate North Carolina law in issuing a marriage license to persons of the same gender.  If, in issuing such a license, the register of deeds

operates in bad faith he may subject himself to [certain civil and criminal] penalties . . . ." Re: Advisory Opinion: Issuance of Marriage Licenses to Individuals of Same Gender; Penalties, N.C. Op. Att'y Gen., 2004 WL 871437 (Mar. 29, 2004).

56.     The Office of the Attorney General recently re-affirmed that opinion, issuing a letter to Defendant Reisenger on October 15, 2013, stating that "issuance of a marriage license to a same-sex couple would be a violation of the law" of North Carolina.

57.     Defendant Cooper and his successors are sued in their official capacity only.

58.     Defendant **Drew Reisinger** is the Register of Deeds for Buncombe County.  In that capacity, he is entrusted with the authority to carry out certain laws of the State, including the issuance of marriage licenses and certificates.

59.     Specifically, Defendant Reisinger presides over applications for marriage licenses, deciding whether a license should be granted.

60.     Defendant Reisinger and his successors are sued in their official capacity only.

61.     Defendant **Ronald L. Moore** is the District Attorney for Buncombe County.  In that capacity, he is the elected public official who represents the State in the prosecution of all criminal matters within Buncombe County, including violations of the North Carolina Marriage Laws.

62.     Defendant Moore and his successors are sued in their official capacity only.

63.     Defendant **Wayne Nixon** is the Register of Deeds for Cabarrus County.  In that capacity, he is entrusted with the authority to carry out certain laws of the State, including the issuance of marriage licenses and certificates.

64.     Specifically, Defendant Nixon presides over applications for marriage licenses, deciding whether a license should be granted.

14

65.     Defendant Nixon and his successors are sued in their official capacity only.

66.     Defendant **Roxann Vaneekhoven** is the District Attorney for Cabarrus County. In that capacity, she is the elected public official who represents the State in the prosecution of all criminal matters within Cabarrus County, including violations of the North Carolina Marriage Laws.

67.     Defendant Vaneekhoven and her successors are sued in their official capacity only.

68.     Defendant **Tonia Hampton** is the Register of Deeds for McDowell County. In that capacity, she is entrusted with the authority to carry out certain laws of the State, including the issuance of marriage licenses and certificates.

69.     Specifically, Defendant Hampton presides over applications for marriage licenses, deciding whether a license should be granted.

70.     Defendant Hampton and her successors are sued in their official capacity only.

71.     Defendant **Bradley Greenway** is the District Attorney for McDowell County. In that capacity, he is the elected public official who represents the State in the prosecution of all criminal matters within McDowell County, including violations of the North Carolina Marriage Laws.

72.     Defendant Greenway and his successors are sued in their official capacity only.

73.     Defendant **J. David Granberry** is the Register of Deeds for Mecklenburg County. In that capacity, he is entrusted with the authority to carry out certain laws of the State, including the issuance of marriage licenses and certificates.

74.     Specifically, Defendant Granberry presides over applications for marriage licenses, deciding whether a license should be granted.

75. Defendant Granberry and his successors are sued in their official capacity only.

76. Defendant **Andrew Murray** is the District Attorney for Mecklenburg County. In that capacity, he is the elected public official who represents the State in the prosecution of all criminal matters within Mecklenburg County, including violations of the North Carolina Marriage Laws.

77. Defendant Murray and his successors are sued in their official capacity only.

78. Defendant **Laura M. Riddick** is the Register of Deeds for Wake County. In that capacity, she is entrusted with the authority to carry out certain laws of the State, including the issuance of marriage licenses and certificates.

79. Specifically, Defendant Riddick presides over applications for marriage licenses, deciding whether a license should be granted.

80. Defendant Riddick and her successors are sued in their official capacity only.

81. Defendant **Ned Mangum** is the District Attorney for Wake County. In that capacity, he is the elected public official who represents the State in the prosecution of all criminal matters within Wake County, including violations of the North Carolina Marriage Laws.

82. Defendant Mangum and his successors are sued in their official capacity only.

83. Defendants all have some connection with the enforcement of the North Carolina Marriage Laws.

84. Defendants' actions constitute actions under color of law.

## FACTUAL BACKGROUND

### The North Carolina Marriage Laws

85. North Carolina law delegates to religious ministers the authority to conduct marriage ceremonies in North Carolina for couples who have obtained a valid license to marry,

which marriages the State then recognizes as legally valid. As stated in North Carolina General Statute § 51-1, a "valid and sufficient marriage is created" when (1) the couple freely consent to the union "[i]n the presence of an ordained minister of any religious denomination, a minister authorized by a church, or a magistrate" and "[w]ith the consequent declaration by the minister or magistrate that the persons are husband and wife"; or (2) "[i]n accordance with any mode of solemnization recognized by any religious denomination, or federally or State recognized Indian Nation or Tribe."

86. However, ministers and others who are authorized to conduct marriages in North Carolina are expressly precluded by State law from performing any ceremony of marriage between same-sex couples, even if their faith and religious beliefs allow them to conduct such ceremonies and recognize those marriages.

87. North Carolina statutory law limits the definition of marriage as being between one man and one woman. North Carolina General Statute § 51-1 also provides in relevant part: "A valid and sufficient marriage is created by the consent of a male and female person who may lawfully marry, presently to take each other as husband and wife . . . ."

88. North Carolina statutory law explicitly provides that marriages by persons of the same gender are not valid. North Carolina General Statute § 51-1.2 provides: "Marriages, whether created by common law, contracted, or performed outside of North Carolina, between individuals of the same gender are not valid in North Carolina."

89. This prohibition also has been made part of the North Carolina constitution through Amendment One, which was approved in the 2011 legislative session of the North Carolina General Assembly and subsequently adopted by ballot initiative on May 8, 2012.

90.     Amendment One appears in the North Carolina Constitution as Article XIV, Section 6 and states: "Marriage between one man and one woman is the only domestic legal union that shall be valid or recognized in this State.  This section does not prohibit a private party from entering into contracts with another private party; nor does this section prohibit courts from adjudicating the rights of private parties pursuant to such contracts."

91.     If a minister conducts any marriage ceremony between same-sex couples, he or she is guilty of a crime:

   a.  North Carolina General Statute § 51-6 states:  "Solemnization without license unlawful.  No minister, officer, or any other person authorized to solemnize a marriage under the laws of this State shall perform a ceremony of marriage between a man and woman, or shall declare them to be husband and wife, until there is delivered to that person a license for the marriage of the said persons, signed by the register of deeds of the county in which the marriage license was issued or by a lawful deputy or assistant."

   b.  North Carolina General Statute § 51-7 states:  "Every minister, officer, or any other person authorized to solemnize a marriage under the laws of this State, who marries any couple without a license being first delivered to that person, as required by law, or after the expiration of such license, or who fails to return such license to the register of deeds within 10 days after any marriage celebrated by virtue thereof, with the certificate appended thereto duly filled up and signed, shall forfeit and pay two hundred dollars ($200.00) to any person who sues therefore, and shall also be guilty of a Class 1 misdemeanor."

92.     Many of the justifications offered by public officials in support of Amendment One and the other Marriage Laws and prohibiting same-sex couples from marrying have been based on a particular religious view regarding marriage and a desire to denigrate same-sex relationships and demean same-sex couples.  Statements in support of Amendment One included the following:

a.  State Senator James Forrester: "The Lord intended for a family to have one man and one woman."[1]

b.  House Majority Leader Paul "Skip" Stam: "'In countries around the world where they have legitimized same-sex marriage, marriage itself is de-legitimized,' Stam said.  'About a fourth of the world allows polygamy. Polygamy would be next.'"[2]

c.  State Senator James Forrester: "We need to reach out to them and get them to change their lifestyle back to the one we accept"; "[The City of Asheville, North Carolina is] a cesspool of sin."[3]

d.  State Senator Wesley Meredith: "'We need to regulate marriage because I believe that marriage is between a man and woman,' [State Senator Wesley Meredith] said.  Meredith said the Bible provides the basis that marriage should be limited to a relationship between a man and a woman."[4]

---

[1] State Senator James Forrester, Sponsor of Amendment One, *Wedding Bills*, The News & Observer (Mar. 2, 2011), http://www.newsobserver.com/2011/03/02/1022741/wedding-bills.html.

[2] Craig Jarvis, Alan M. Wolf & Mary Cornatzer, *GOP pushes same-sex marriage amendment*, The News & Observer (Aug. 31, 2011),   http://www.newsobserver.com/2011/08/31/1448973/gop-pushes-same-sex-marriage-amendment.html#storylink=cpy.

[3] Rob Schofield, *Anti-gay lawmakers speak their (very troubled) minds*, The Progressive Pulse (Sept. 9, 2011), http://pulse.ncpolicywatch.org/2011/09/09/anti-gay-lawmakers-speak-their-very-troubled-minds.

[4] Paul Woolverton, *N.C. Senate Approves Amendment to Block Gay Marriage*, Fayetteville Observer (Sept. 14, 2011), http://www.fayobserver.com/news/state/article_df7d48cf-1770-5f59-9975-11bc83b05347.html.

*Impact Of And Irreparable Harm Caused By The North Carolina Marriage Laws*

93.     Marriage between two loving individuals is both a fundamental legal right and a cornerstone of almost every religion.

94.     Marriage creates mutual support systems and stable relationships for couples who promise to spend their whole lives together.  It creates more stable futures for the couples, and serves as a building block for larger family units.  Married couples and their families also function as units within their religions and the larger communities in which they live.

95.     The State of North Carolina, as well as the Federal Government, has chosen to recognize the societal importance of marriage by conferring benefits on married persons that it does not offer to single persons or even to couples that are not married.  Among other things, married spouses may file joint tax returns, receive health benefits on a spouse's health plan, have special rights when a spouse is hospitalized, and have certain automatic rights of survivorship upon a spouse's death.  As a result of the North Carolina Marriage laws, the Couple Plaintiffs, as well as all similarly situated individuals who reside in North Carolina and who wish to marry another same-sex person, are categorically denied these benefits.

96.     The benefits of marriage are equally important and valid for same-sex couples as for opposite-sex couples.

97.     The North Carolina Marriage Laws categorically and unconditionally prohibit same-sex couples from enjoying the benefits of marriage, and preclude the free and uninhibited exercise of Plaintiffs' religious beliefs.  Under the North Carolina Marriage Laws, the Religious Denomination, Minister, and Couple Plaintiffs are precluded even from conducting a marriage ceremony of any kind between two same-sex individuals.  This represents an unlawful government intervention into the internal structure and practices of Plaintiffs' religions.

98.     By depriving the Plaintiffs of the freedom to perform religious marriage ceremonies or to marry, North Carolina stigmatizes Plaintiffs and their religious beliefs, and the State relegates the Couple Plaintiffs to second-class status.  The laws forbidding same-sex marriage tell Plaintiffs that their religious views are invalid and same-sex relationships are less worthy, thus humiliating each Plaintiff and denigrating the integrity and closeness of families and religious organizations, depriving Plaintiffs of the inclusive religious community of family units they wish to establish.

99.     Furthermore, the North Carolina Marriage Laws, by preventing Plaintiffs from fully expressing their embrace and support of same-sex marriage on an equal basis with opposite-sex marriage, force Plaintiffs to either abstain from the recognition of marriage entirely, or else convey, against their will, the impression that opposite-sex marriages are more valued in the eyes of their respective faiths.

100.    Defendants, in executing and enforcing the Marriage Laws, are acting under color of state law and thus depriving Plaintiffs of rights secured by the United States Constitution in violation of 42 U.S.C. § 1983.

## CLAIMS

### COUNT I
**First Amendment — Free Exercise**
**(All Plaintiffs)**

101.    Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

102.    The First Amendment to the United States Constitution states: "Congress shall make no law . . . prohibiting the free exercise [of religion] . . . ."

103.    This prohibition is extended to the states through the Fourteenth Amendment.

Case 3:14-cv-00213   Document 1   Filed 04/28/14   Page 21 of 29

104.     The North Carolina Marriage Laws make it a criminal offense for any "minister, officer, or any other person authorized to solemnize a marriage under the laws of [North Carolina]," to solemnize the marriage of a same-sex couple.  N.C. Gen. Stat. § 51-7.

105.     Plaintiffs are (1) a religious denomination, (2) ministers, and (3) congregants whose religious teaching and beliefs embrace same-sex marriage and allow such couples full access to the marriage rites of that faith, solemnizing and celebrating their marriage.

106.     Under North Carolina law, the Clergy Plaintiffs are prohibited under threat of criminal prosecution from performing any such religious ceremonies, and the Couple Plaintiffs are prohibited from becoming married in the tradition of their respective faiths.  Such laws violate the First Amendment's Free Exercise Clause.

107.     Plaintiffs have no adequate remedy at law to redress the wrongs alleged herein, which are of a continuing nature, subject them to criminal sanctions, and cause irreparable harm by burdening the free exercise of religion without any justification, let alone a compelling one.

108.     Accordingly, Plaintiffs are entitled to declaratory and injunctive relief as requested in this Complaint.

## COUNT II
### First Amendment — Expressive Association
### (All Plaintiffs)

109.     Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

110.     "[I]mplicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, *religious*, and cultural ends."  *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (emphasis added) (internal quotation marks omitted).  Government may not burden

Case 3:14-cv-00213   Document 1   Filed 04/28/14   Page 22 of 29

this freedom through "intrusion into the internal structure or affairs of an association." *Id*. at 648.

111. This prohibition is extended to the states through the Fourteenth Amendment.

112. The practice of conducting and participating in religious marriage ceremonies for same-sex couples is a constitutionally protected activity of expressive association. As reflected above, the religious teachings and activities of the Plaintiffs reflect the belief that same-sex couples wishing to be married should be afforded rights equal to, and be treated with the same dignity as, opposite-sex couples.

113. For example, the Denominational Plaintiff has an almost 40-year history of expressing support for, and advocating the equality of, same-sex couples, and amended its Book of Worship to permit a common religious ceremony for the religious recognition of a marriage of adult couples, be they gay or straight.

114. The North Carolina Marriage Laws, which make it a criminal offense for any "minister, officer, or any other person" to solemnize the marriage of a same-sex couple, impermissibly intrude on Plaintiffs' First Amendment rights by imposing significant burdens on their rights of expression association.

115. Plaintiffs have no adequate remedy at law to redress the wrongs alleged herein, which are of a continuing nature, subject them to criminal sanctions, and cause irreparable harm by burdening their associational rights without any justification, let alone a compelling one.

116. Accordingly, Plaintiffs are entitled to declaratory and injunctive relief as requested in this Complaint.

## COUNT III
## Denial of Due Process — Fundamental Right to Marry
### (On Behalf of the Couple Plaintiffs)

117.    The Couple Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

118.    The Fourteenth Amendment to the United States Constitution precludes any State from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Governmental interference with a fundamental right may be sustained only upon a showing that the legislation is closely tailored to serve an important governmental interest.

119.    Under the Due Process Clause of the Fourteenth Amendment, marriage is a fundamental right, and choices about marriage, like choices about other aspects of family, are a central part of the liberty protected by the Due Process Clause.

120.    North Carolina law denies the Couple Plaintiffs and other same-sex couples this fundamental right by denying them access to the state-recognized institution of marriage.

121.    North Carolina can demonstrate no important interest to justify denying the Couple Plaintiffs this fundamental right. Indeed, North Carolina cannot demonstrate that the denial is tailored to any legitimate interest at all.

122.    North Carolina's prohibition of marriage between persons of the same sex violates the Due Process Clause.

123.    The Couple Plaintiffs have no adequate remedy at law to redress the wrongs alleged herein, which are of a continuing nature and will cause them irreparable harm.

124.    Accordingly, the Couple Plaintiffs are entitled to declaratory and injunctive relief as requested in this Complaint.

125.    The Couple Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

126.    Article XIV, Section 6 of the Constitution of North Carolina and North Carolina General Statutes §§ 51-1, 51-1.2, 51-6, and 51-7 violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, both on their face and as applied to Plaintiffs.

127.    These laws restrict civil marriage to individuals of the opposite sex; gay and lesbian individuals are unable to marry.  Thus, North Carolina law treats similarly-situated people differently by providing civil marriage to opposite-sex couples, but not to same-sex couples, which are expressly precluded from enjoying the panoply of rights associated with marriage.  Gay men and lesbians are, therefore, unequal in the eyes of state law, and their families are denied the same respect as officially sanctioned families of opposite-sex individuals.

128.    By purposefully denying civil marriage to gay and lesbian individuals, North Carolina's ban on same-sex marriage discriminates on the basis of sexual orientation.  Gay and lesbian individuals are unable to enter into marriages available through the State to opposite-sex couples solely because of their sexual orientation.  Accordingly, these laws violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by casting gays and lesbians into disfavored legal status and categorizing them as "second-class citizens."

129.    These laws also violate the Equal Protection Clause because they discriminate on the basis of sex.  Under these laws, a man who wishes to marry a man may not do so because he

is a man, and a woman may not marry a woman because she is a woman. Thus, the laws limit civil marriage on the basis of sex.

130. North Carolina's Marriage Laws directly and substantially interfere with the Couple Plaintiffs' fundamental right to marry. The right to marry is protected by the Fourteenth Amendment as a vital personal right that is integral to an individual's identity, autonomy, dignity, and intimate associations. North Carolina's laws restricting civil marriage to opposite-sex couples infringe on the fundamental right of gay and lesbian individuals to marry without serving any legitimate governmental interest, let alone any important or compelling interest to which they are narrowly tailored.

131. Whether under a strict or heightened scrutiny analysis, or under a more lenient rational-basis analysis, these provisions of North Carolina law and the State's constitution do not bear any relation to a legitimate governmental purpose and, thus, violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

132. The Couple Plaintiffs have no adequate remedy at law to redress the wrongs alleged herein, which are of a continuing nature and will cause them irreparable harm.

133. Accordingly, the Couple Plaintiffs are entitled to declaratory and injunctive relief as requested in this Complaint.

## **IRREPARABLE INJURY**

134. Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

135. Plaintiffs are severely and irreparably injured by the challenged state laws and constitutional provision that violate the First Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. By way of example only, Plaintiffs' injuries

as a result of these discriminatory laws include the impairment of the free exercise of religion for all Plaintiffs; the deprivation of rights guaranteed the Couple Plaintiffs by the Fourteenth Amendment; and the severe humiliation, emotional distress, pain, suffering, psychological harm, and stigma caused by the inability of the Couple Plaintiffs to marry and have society accord their unions and their families the same respect and dignity enjoyed by opposite-sex unions and families. Because the Couple Plaintiffs cannot marry under North Carolina law, they cannot currently receive social security benefits or favorable treatment on income and estate taxes prescribed by State law. They also cannot currently claim benefits under various federal laws that apply only to married couples. Plaintiffs' injuries will be redressed only if this Court declares these provisions unconstitutional and enjoins Defendants from enforcing them.

136. An actual and judicially cognizable controversy exists between Plaintiffs and Defendants regarding whether the laws violate the First Amendment and the Due Process and Equal Protection clauses of the Fourteenth Amendment. Defendants are presently enforcing these State laws to the detriment of Plaintiffs.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request this Court:

A. To issue a declaratory judgment that the statutes and North Carolina constitutional provision at issue in this case, as applied to Plaintiffs, violate the constitutional and statutory rights of Plaintiffs;

B. To issue a preliminary and permanent injunction against any and all laws that impose or threaten criminal sanctions or otherwise prohibit the performance of religious rites that solemnize the union of same-sex couples, as denying all Plaintiffs their First Amendment, Free Exercise right to engage in such religious ceremonies, and their right to expressive association under the First Amendment.

27

C.       To issue a preliminary and permanent injunction against the Defendants and all those acting in concert with them to prohibit enforcement of laws that deprive the Couple Plaintiffs and all other same-sex couples of the right to marry in accordance with Plaintiffs' constitutional rights to Due Process and Equal Protection under the Fourteenth Amendment.

D.       To issue a preliminary and permanent injunction against the Defendants and all those acting in concert with them to prohibit enforcement of laws that deprive the Minister Plaintiffs the right to perform such marriages and give them legal effect and directing the Defendants to recognize marriages validly entered into by the Couple Plaintiffs and other same-sex couples.

E.       To award to Plaintiffs reasonable costs, expenses, and attorneys' fees; and

F.       To award such other and further relief as this Court shall deem just and reasonable.

Dated:  April 28, 2014

Respectfully submitted,

Jonathan S. Martel
David J. Weiner
Samuel Witten
Sarah E. Warlick
Thomas A. Glazer
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004
Phone: (202) 942-5470
Fax: (202) 942-5999
Email:  jonathan.martel@aporter.com
*Pro Hac Vice Applications Pending*

Sean Morris
Arnold & Porter LLP
777 South Figueroa St.
Los Angeles, CA 90017
Phone: (213) 243-4222
Email: sean.morris@aporter.com
*Pro Hac Vice Application Pending*

/s/ S. Luke Largess
S. Luke Largess
/s/ Jacob H. Sussman
Jacob Sussman
/s/ John W. Gresham
John W. Gresham
Tin Fulton Walker & Owen
301 East Park Avenue
Charlotte, NC 28203
Phone:  (704) 338-1220
Fax: (704) 338-1312
Email: llargess@tinfulton.com
Email: jsussman@tinfulton.com
Email: jgresham@tinfulton.com

Mark Kleinschmidt
Tin Fulton Walker & Owen
312 West Franklin Street
Chapel Hill NC 27516
Phone: (919) 240-7089
Fax: (919) 240-7822
Email: mkleinschmidt@tinfulton.com

ATTORNEYS FOR PLAINTIFFS