# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

|  |  |
|---|---|
| **General Synod of The United Church of Christ; Reverend Joseph Hoffman; Reverend Nancy Ellett Allison; Reverend Nathan King; Reverend Nancy Kraft; Rabbi Jonathan Freirich; Reverend Robin Tanner; Reverend Mark Ward; Reverend Dr. Nancy E. Petty; Kay Diane Ansley; Catherine "Cathy" McGaughey; Elizabeth "Lisa" Cloninger; Kathleen Smith; Shauna Bragan; Stacy Maloney; Cathy Fry; Joanne Marinaro; Joel Blady; Jeffrey Addy; Betty Mack; and Carol Taylor;**<br><br>Plaintiffs,<br><br>v.<br><br>**Roy Cooper, Attorney General of North Carolina; Drew Reisinger, Register of Deeds for Buncombe County; Wayne Nixon, Register of Deeds for Cabarrus County; Tonia Hampton, Register of Deeds for McDowell County; J. David Granberry, Register of Deeds for Mecklenburg County; Laura M. Riddick, Register of Deeds for Wake County; Ronald L. Moore, Buncombe County District Attorney; Roxann Vaneekhoven, Cabarrus County District Attorney; Bradley Greenway, McDowell County District Attorney; Andrew Murray, Mecklenburg County District Attorney; and Ned Mangum, Wake County District Attorney;**<br><br>Defendants. | Civ. No. 3:14-cv-213 |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF THE FACTS .......................................................................... 5

1. THE CURRENT MARRIAGE LAWS OF NORTH CAROLINA ........................................ 6

2. PLAINTIFFS ........................................................................................... 9

   A. The Denominational Plaintiff .................................................................. 9

   B. The Clergy Plaintiffs ......................................................................... 10

   C. The Plaintiff Couples ........................................................................ 13

3. DEFENDANTS ......................................................................................... 16

4. QUESTIONS PRESENTED ............................................................................ 17

5. ARGUMENT ............................................................................................ 17

   A. North Carolina's Laws Banning Same-Sex Marriage Violate the First Amendment's Free Exercise Clause .......................................................................... 18

   B. North Carolina's Ban on Religious Marriage Ceremonies Violates Plaintiffs' First Amendment Rights to Expressive Association ................................................ 22

   C. North Carolina's Laws Banning Same-Sex Marriage Violate the Due Process Clause of the Fourteenth Amendment ................................................................... 26

   D. North Carolina's Laws Banning Same-Sex Marriage Violate the Equal Protection Clause of the Fourteenth Amendment ......................................................... 29

   E. The Marriage Laws Cannot Withstand Rational Basis Review; The Laws Therefore Fail Under Any Form Of Heightened Scrutiny ................................................ 31

   F. The Balance of the Equities Favors Plaintiffs ............................................. 37

   G. A Preliminary Injunction Is In The Public Interest ....................................... 38

6. CONCLUSION ......................................................................................... 38

Case 3:14-cv-00213   Document 5   Filed 04/28/14   Page 2 of 47

## TABLE OF AUTHORITIES

Page(s)

C ASES

*Baehr v. Lewin*,
  74 Haw. 530 (1993) ...........................................................................................6, 7

*Bishop v. United States ex rel. Holder*,
  962 F.Supp.2d 1252 (N.D. Okla. 2014), *appeal docketed*, No. 14-5006 (10th Cir.
  Jan. 27, 2014) ...........................................................................................5, 30, 32

*Blackhawk v. Pennsylvania*,
  381 F.3d 202 (3d Cir. 2004)...........................................................................21

*Boddie v. Connecticut*,
  401 U.S. 371 (1971)...........................................................................................1

*Bostic v. Rainey*,
  No. 2:13cv395, 2014 WL 561978 (E.D. Va. Feb. 14, 2014), *appeal docketed*, No. 14-
  1169 (4th Cir. Feb. 25, 2014).....................................................................5, 28, 30, 32

*Bourke v. Beshear*,
  No. 3:13–CV–750–H, 2014 WL 556729 (W.D. Ky. Feb. 12, 2014), *appeal docketed*,
  No. 14-5291 (6th Cir. Mar. 19, 2014).........................................................5, 30, 32

*Boy Scouts of Am. v. Dale*,
  530 U.S. 640 (2000)............................................................................. passim

*Cantwell v. State of Connecticut*,
  310 U.S. 296 (1940).......................................................................................18

*Centro Tepeyac v. Montgomery Cnty.*,
  722 F.3d 184 (4th Cir. 2013) .......................................................................37, 38

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993).......................................................................................20

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985).......................................................................................29

*De Leon v. Perry*,
  No. SA–13–CV–00982–OLG, 2014 WL 715741 (W.D. Tex. Feb. 26, 2014), *appeal
  docketed*, No. 14-50196 (5th Cir. Mar. 1, 2014).....................................................5, 28, 30, 32

*DeBoer v. Snyder*,
  No. 12–CV–10285, 2014 WL 1100794 (E.D. Mich. Mar. 21, 2014), *appeal docketed*,
  No. 14-1341 (6th Cir. Mar. 21, 2014).........................................................5, 30, 32, 33

Case 3:14-cv-00213   Document 5   Filed 04/28/14   Page 3 of 47

*Employment Division, Dep't of Human Resources of Oregon v. Smith*,
    494 U.S. 872 (1990)..................................................................................20, 21, 26

*Faust v. S.C. State Highway Dep't*,
    721 F.2d 934 (4th Cir. 1983) ........................................................................30

*Griswold v. Connecticut*,
    381 U.S. 479 (1965)....................................................................................1, 27

*Heller v. Doe*,
    509 U.S. 312 (1993)........................................................................................32

*Henry v. Greenville Airport Comm'n*,
    284 F.2d 631 (4th Cir. 1960) (per curiam)...................................................36

*Hosanna-Tabor Evangelical Lutheran Church and School v. Equal Employment
    Opportunity Comm'n*,
    132 S.Ct. 694 (S. Ct. 2012) ........................................................3, 18, 19, 24

*Houey v. Carolina First Bank*,
    890 F. Supp. 2d 611 (W.D.N.C. 2012) ........................................................18

*Hurley v. Irish-Am. Gay Grp. of Boston*,
    515 U.S. 557 (1995)........................................................................................25

*Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*,
    566 F.3d 138 (4th Cir. 2009) ........................................................................22

*Johnson v. Bergland*,
    586 F.2d 993 (4th Cir. 1978) ........................................................................36

*Kitchen v. Herbert*,
    961 F. Supp. 2d 1181 (D. Utah 2013), *appeal docketed*, No. 13-4178 (10th Cir. Dec.
    20, 2013) ................................................................................................. passim

*Lawrence v. Texas*,
    539 U.S. 558 (2003)................................................................................. passim

*Lee v. Orr*,
    No. 13-CV-8719, 2014 WL 683680 (N.D. Ill. Feb. 21, 2014) ......................5

*Legend Night Club v. Miller*,
    637 F.3d 291 (4th Cir. 2011) ........................................................................36

*Loving v. Virginia*,
    388 U.S. 1 (1967).................................................................................1, 27, 31

Case 3:14-cv-00213   Document 5   Filed 04/28/14   Page 4 of 47

*M.L.B. v. S.L.J.*,
    519 U.S. 102 (1996) ............................................................................................27

*MacDonald v. Moose*,
    710 F.3d 154 (4th Cir. 2013) ...........................................................................30

*Mass. Bd. of Ret. v. Murgia*,
    427 U.S. 307 (1976) (per curiam) ....................................................................30

*Massachusetts v. U.S. Dep't of Health & Human Servs.*,
    682 F.3d 1 (1st Cir. 2012) ................................................................................31

*Maynard v. Hill*,
    125 U.S. 190 (1888) ...........................................................................................1

*Mobil Oil v. Attorney General of Com. of VA*,
    940 F.2d 73 (4th Cir. 1991) .............................................................................37

*Nev. Dep't of Human Res. v. Hibbs*,
    538 U.S. 721 (2003) .........................................................................................34

*Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*,
    354 F.3d 249 (4th Cir. 2003) ...........................................................................38

*Obergefell v. Wymyslo*,
    962 F. Supp. 2d 968 (S.D. Ohio 2013), *appeal docketed*, No. 14-3057 (6th Cir. Jan.
    22, 2014) .............................................................................................5, 28, 33

*Palmore v. Sidoti*,
    466 U.S. 429 (1984) .........................................................................................34

*Perry v. Schwarzenegger*,
    704 F. Supp. 2d 921 (N.D. Cal. 2010) .......................................................31, 34

*Petruska v. Gannon Univ.*,
    462 F.3d 294 (3d Cir. 2006) ............................................................................19

*Planned Parenthood of Se. Pa. v. Casey*,
    505 U.S. 833 (1992) .........................................................................................26

*Roberts v. United States Jaycees*,
    468 U.S. 609 (1984) ...........................................................................3, 23, 25, 28

*Romer v. Evans*,
    517 U.S. 620 (1996) .........................................................................................32

*Saint v. Neb. Sch. Activities Ass'n*,
    684 F. Supp. 626 (D. Neb. 1988) .....................................................................38

Case 3:14-cv-00213   Document 5   Filed 04/28/14   Page 5 of 47

*Tanco v. Haslam*,
3:13-CV-01159, 2014 WL 997525 (M.D. Tenn. Mar. 14, 2014), *appeal docketed*, No.
14-5297 (6th Cir. Mar. 19, 2014) ................................................................................5

*Thigpen v. Cooper*,
739 S.E. 2d 165 (N.C. App. 2013) ............................................................................17

*Thomasson v. Perry*,
80 F.3d 915 (4th Cir. 1996) ......................................................................................30

*Turner v. Safley*,
482 U.S. 78 (1987) ...............................................................................................21, 26

*United States v. Virginia*,
518 U.S. 515 (1996) ..................................................................................................31

*United States v. Windsor*,
133 S.Ct. 2675 (2013) ........................................................................................ passim

*Veney v. Wyche*,
293 F.3d 726 (4th Cir. 2002) ...............................................................................30, 31

*Washington v. Glucksberg*,
521 U.S. 702 (1997) ..................................................................................................29

*Winter v. Natural Res. Def. Council*,
555 U.S. 7 (2008) ......................................................................................................18

*WV Ass'n of Club Owners v. Musgrave*,
553 F.3d 292 (4th Cir. 2009) ....................................................................................18

*Zablocki v. Redhail*,
434 U.S. 374 (1978) ..................................................................................................26

CONSTITUTIONS

N.C. Const. Art. XIV, § 6 .............................................................................................1, 2

U.S. Const. amend. XIV, § 1 .........................................................................................3, 26

STATUTES

1 U.S.C. § 7 .......................................................................................................................6

28 U.S.C. § 1738C ............................................................................................................6

42 U.S.C. § 1983 ...............................................................................................................4

N.C. Gen. Stat. § 51-1 ...............................................................................................1, 6, 8

N.C. Gen. Stat. § 51-1.2 .............................................................................................1, 2, 6

N.C. Gen. Stat. § 51-6 .................................................................................................1, 6, 8

N.C. Gen. Stat. § 51-7 ................................................................................................. passim

N.C. Gen. Stat. § 114-2 ...........................................................................................................16

Pub.L. 104–199, 110 Stat. 2419 (1996) ...............................................................................6

OTHER AUTHORITIES

Douglas Laycock, et al., Afterword, in Same-Sex Marriage and Religious Liberty (2008) .........21

Fredric J. Bold, Jr., Comment, Vows to Collide: The Burgeoning Conflict Between
    Religious Institutions and Same-Sex Marriage Antidiscrimination Laws, 158 U. Pa.
    L. Rev. 179 (2009) .............................................................................................21

North Carolina General Assembly,
    http://www.ncga.state.nc.us/gascripts/BillLookUp/BillLookUp.pl?Session=2011&Bil
    lID= S514&votesToView=all .............................................................................7

North Carolina State Board of Elections,
    http://results.enr.clarityelections.com/NC/36596/85942/en/summary.html. ...........7

Paul Woolverton, N.C. Senate Approves Amendment to Block Gay Marriage, Fayetteville
    Observer (Sept. 14, 2011), http://www.fayobserver.com/news/state/article_df7d48cf-
    1770-5f59-9975-11bc83b05347.html .............................................................7, 23

Re: Advisory Opinion: Issuance of Marriage Licenses to Individuals of Same Gender;
    Penalties, N.C. Op. Att'y Gen., 2004 WL 871437 (2004) .............................6, 8, 16

House Report 104-664: Defense of Marriage Act, H.R. REP. 104-664, 1996
    U.S.C.C.A.N. 2905. ............................................................................................7

Rob Schofield, Anti-gay lawmakers speak their (very troubled) minds, The Progressive
    Pulse (Sept. 9, 2011), http://pulse.ncpolicywatch.org/2011/09/09/anti-gay-lawmakers-
    speak-their-very-troubled-minds ..........................................................................22

Wedding Bills, The News and Observer (Mar. 2, 2011),
    http://www.newsobserver.com/2011/03/02/1022741/wedding-bills.html ..........7, 22

## PRELIMINARY STATEMENT

Marriage is the fundamental building block for organizing family, community and society. It is both of "basic importance in our society," *Boddie v. Connecticut*, 401 U.S. 371, 376 (1971), and "sacred," *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965). It is "the most important relation in life, as having more to do with the morals and civilization of a people than any other institution." *Maynard v. Hill*, 125 U.S. 190, 205 (1888). As Mildred Loving explained on the 40th anniversary of the Supreme Court decision in *Loving v. Virginia*, 388 U.S. 1 (1967), striking down Virginia's anti-miscegenation law under which she and her husband had been convicted and sentenced to jail for marrying each other: "I believe all Americans, no matter their race, no matter their sex, no matter their sexual orientation, should have that same freedom to marry. Government has no business imposing some people's religious beliefs over others.... I support the freedom to marry for all. That's what *Loving*, and loving, are all about." Mildred Loving, Loving for All, Public Statement on the 40th Anniversary of *Loving v. Virginia* (June 12, 2007).

Plaintiffs in this action are a religious denomination and clergy from various traditions whose religious teachings and beliefs embrace same-sex marriage and afford equal access to the marriage rites of their faith to all committed couples who wish to be married within their faith and community in North Carolina. Plaintiffs bring this action to challenge the constitutionality of, collectively, the "Marriage Laws" of the State of North Carolina, including Article XIV, Section 6 of the Constitution of North Carolina ("Amendment One") and North Carolina General Statutes §§ 51-1, 51-1.2, 51-6, 51-7.

The Marriage Laws recognize only one type of marriage: a union between a male and female person. N.C. Gen. Stat. § 51-1. Marriages between same-sex couples are not valid.

1

North Carolina General Statute § 51-1.2 mandates: "Marriages, whether created by common law, contracted, or performed outside of North Carolina, between individuals of the same gender are not valid in North Carolina." Amendment One enshrined this prohibition in the North Carolina Constitution: "Marriage between one man and one woman is the only domestic legal union that shall be valid or recognized in this State." N.C. Const. art. XIV, § 6.

But the Marriage Laws do not simply withhold the benefits of marriage from same-sex couples; the Laws directly regulate religious practice. Ministers authorized to conduct marriages in North Carolina are barred by the Marriage Laws from performing *any* ceremony of marriage between same-sex couples, even if their faith and religious beliefs allow them to consecrate same-sex unions in the same manner as opposite-sex marriages. A minister who, following his or her own religious beliefs, performs a marriage ceremony for a same-sex couple, commits a crime according to North Carolina law. N.C. Gen. Stat. § 51-7. Under threat of criminal sanction, and at risk of civil suit, these laws thereby attempt to bar clergy and same-sex couples from partaking in marriage rites in North Carolina that build the families and faith communities that are essential to the vitality of their religions.

The Marriage Laws violate the Plaintiffs' constitutional rights in several ways. First, the Laws violate the First Amendment's Free Exercise Clause because they impermissibly chill religious practice by purporting to tell clergy -- backed by the full force of criminal law and threat of civil liability -- what *religious* ceremonies they may perform. The Marriage Laws accomplish this unconstitutional regulation by specifying that ministers who "solemnize" a marriage without a license, available only to opposite-sex couples, may be sued civilly and prosecuted criminally. N.C. Gen. Stat. § 51-7. By regulating the conduct of clergy in performing religious rites and criminalizing those clergy who "solemnize" marriages -- *i.e.*,

2

perform the religious rite that their faith allows -- the Marriage Laws impermissibly interfere with an "internal church decision that affects the faith and mission of the church itself." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 132 S.Ct. 694, 707 (2012). Of course, the Marriage Laws thus impact the Plaintiff Couples who wish to marry within their faith communities in North Carolina. Accordingly, the Marriage Laws violate the Free Exercise Clause as to all Plaintiffs.

Second, the Marriage Laws violate the First Amendment's "right to associate with others in pursuit of a wide variety of political, social, economic, educational, *religious*, and cultural ends." *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984) (emphasis added). "[W]hen the State interferes with individuals' selection of those with whom they wish to join in a common endeavor, freedom of association . . . may be implicated." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 678 (2000) (internal quotation marks omitted). Government, including state governments by way of the Fourteenth Amendment, may not burden this freedom through "intrusion into the internal structure or affairs of an association." *Id*. at 648 (internal quotation marks omitted). The expressive acts of conducting and participating in a religious marriage ceremony for a same-sex couple that reflects a shared theological belief of those present is constitutionally protected.

Third, the Marriage Laws violate the Due Process Clause of the Fourteenth Amendment, which precludes any State from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. It is well established that marriage is a fundamental right and that choices about marriage, like choices about other aspects of family, are a central part of the liberty protected by the Due Process Clause. The Marriage Laws unlawfully burden that fundamental constitutional right.

3

Finally, the Marriage Laws also violate the Equal Protection Clause of the Fourteenth Amendment by discriminating on the basis of sexual orientation and gender, classifying gay and lesbian individuals as second-class citizens with disfavored legal status. The laws treat similarly-situated people differently without a rational basis by sanctioning and providing the benefits of marriage for opposite-sex couples, but not to same-sex couples. Gays and lesbians are, therefore, unequal in the eyes of North Carolina law, and their families are denied the same rights and respect afforded to families of opposite-sex individuals.

Because the Marriage Laws implicate Plaintiffs' constitutional rights to the free exercise of religion, expressive association, due process, and equal protection, they are properly subject to heightened if not strict scrutiny. Moreover, the Marriage Laws are not justified by a compelling or significant state interest and, even if they were, they are not narrowly or closely tailored. In any event, even without strict scrutiny, the Marriage Laws cannot withstand scrutiny under even the rational basis test. As nine federal courts have recognized over the past ten months, state laws that ban same-sex couples from marrying, like the Marriage Laws, are arbitrary and irrational and cannot be justified by any legitimate governmental purpose. As the U.S. Supreme Court and numerous federal district courts have recognized, laws based on animus and moral condemnation of same-sex couples are unconstitutional under the rational basis test. That is true here.

Plaintiffs have filed a Complaint pursuant to 42 U.S.C. § 1983 seeking declaratory and injunctive relief to protect rights secured to them by the First and Fourteenth Amendments to the United States Constitution. Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs move for a preliminary injunction to prevent these violations of their constitutional rights from continuing

4

and submit this memorandum of law and appendix of exhibits in support of their motion. Plaintiffs can establish each of the elements required to grant a preliminary injunction:

(1) Plaintiffs have a high likelihood of success on the merits. In recent months, nine district courts have struck down restrictions on same-sex marriage, including courts in Michigan, Tennessee, Texas, Illinois, Virginia, Kentucky, Oklahoma, Ohio, and Utah.[1] No courts have upheld such a ban. The denial of constitutional rights at issue in this case cannot withstand any level of constitutional scrutiny.

(2) Plaintiffs are subject to ongoing irreparable harm. Plaintiffs are currently deprived of fundamental constitutional rights secured to them by the First and Fourteenth Amendments. This alone is sufficient basis to establish irreparable harm. Moreover, same-sex couples are deprived of the same rights and benefits of marriage that are afforded opposite-sex couples.

(3) The balance of the equities favors Plaintiffs. There is no harm to the State in extending the right to marry same-sex couples.

(4) The public interest is best served by upholding Plaintiffs' constitutional rights.

## STATEMENT OF THE FACTS

Because this suit challenges the constitutionality of certain provisions of North Carolina's marriage statutes and the state constitutional provision known as Amendment One, Plaintiffs first set out those laws and then describe how the Marriage Laws impacts them.

---

[1] *See DeBoer v. Snyder*, No. 12–CV–10285, 2014 WL 1100794 (E.D. Mich. Mar. 21, 2014), *appeal docketed*, No. 14-1341 (6th Cir. Mar. 21, 2014); *Tanco v. Haslam*, 3:13-CV-01159, 2014 WL 997525 (M.D. Tenn. Mar. 14, 2014), *appeal docketed*, No. 14-5297 (6th Cir. Mar. 19, 2014); *De Leon v. Perry*, No. SA–13–CV–00982–OLG, 2014 WL 715741 (W.D. Tex. Feb. 26, 2014), *appeal docketed*, No. 14-50196 (5th Cir. Mar. 1, 2014); *Lee v. Orr*, No. 13-CV-8719, 2014 WL 683680 (N.D. Ill. Feb. 21, 2014); *Bostic v. Rainey*, No. 2:13cv395, 2014 WL 561978 (E.D. Va. Feb. 14, 2014), *appeal docketed*, No. 14-1169 (4th Cir. Feb. 25, 2014); *Bourke v. Beshear*, No. 3:13–CV–750–H, 2014 WL 556729 (W.D. Ky. Feb. 12, 2014), *appeal docketed*, No. 14-5291 (6th Cir. Mar. 19, 2014); *Bishop v. United States ex rel. Holder*, 962 F. Supp. 2d 1252 (N.D. Okla. 2014), *appeal docketed*, No. 14-5006 (10th Cir. Jan. 27, 2014); *Obergefell v. Wymyslo*, No. 1:13-CV-501, 2013 WL 7869139 (S.D. Ohio Dec. 23, 2013), *appeal docketed*, No. 14-3057 (6th Cir. Jan. 22, 2014); *Kitchen v. Herbert*, 961 F. Supp. 2d 1181 (D. Utah 2013), *appeal docketed*, No. 13-4178 (10th Cir. Dec. 20, 2013).

### 1. THE CURRENT MARRIAGE LAWS OF NORTH CAROLINA

North Carolina law has three components that create the constitutional issues in this case (referenced collectively as the "Marriage Laws").

First, the laws limit marriage only to heterosexual couples and explicitly reject the validity of same-sex marriage. A lawful marriage requires the "consent of a male and female person" to "take each other as husband and wife." N.C. Gen. Stat. § 51-1. Only a man and woman can obtain a license to marry. *See* N.C. Gen. Stat. § 51-6; *see also* Re: Advisory Opinion: Issuance of Marriage Licenses to Individuals of Same Gender; Penalties, N.C. Op. Att'y Gen., 2004 WL 871437, at *2 (Mar. 29, 2004) (expressing opinion that "a register of deeds would violate North Carolina law in issuing a marriage license to persons of the same gender").

The North Carolina General Assembly voted in June 1996 to expressly prohibit recognition of same-sex marriages following the first court ruling, from the Hawaii Supreme Court, permitting a state constitutional challenge to proceed against a same-sex marriage ban. *See Baehr v. Lewin*, 74 Haw. 530 (1993). *Baehr* triggered a wave of legislation at the state and federal level to expressly deny the validity of any such marriages. The North Carolina law passed after the legislature obtained an advisory opinion from the Attorney General about the recognition of same-sex marriages from other states,[2] and it established that "[m]arriages, whether created by common law, contracted, or performed outside of North Carolina, between individuals of the same gender are not valid in North Carolina." N.C. Gen. Stat. § 51-1.2.[3]

---

[2] *See* RE: Advisory Opinion: Validity of Same-Sex Marriages Performed in Other States, N.C.G.S. §51-1, N.C. Op. Att'y Gen., 1996 WL 925102 (May 14, 1996).

[3] The federal government similarly responded to *Baehr* with the passage of the federal Defense of Marriage Act (DOMA). *See* Pub.L. 104–199, 110 Stat. 2419 (1996) (codified at 1 U.S.C. § 7 and 28 U.S.C. § 1738C). Indeed, the House Judiciary Committee's 1996 Report explicitly called for DOMA as a response to *Baehr*, because "a redefinition of marriage in Hawaii to include homosexual couples could make such couples eligible for a whole range of federal rights and benefits." House Report 104-664: Defense of Marriage Act, H.R. REP. 104-664, 10, 1996 U.S.C.C.A.N. 2905, 2914.

In 1998, Hawaii passed a constitutional amendment overturning *Baehr* and defining marriage as exclusively between opposite-sex couples. This prompted a second wave of law-making against same-sex marriage -- this time in the form of state constitutional amendments. On April 6, 2011, legislators introduced Senate Bill 514, later to become known as Amendment One. The bill sought to place the proposed constitutional amendment on the ballot for a popular vote. On September 12, 2011, the bill passed the North Carolina House by a vote of 75 to 42. One day later the bill passed the North Carolina Senate by a vote of 30 to 16.[4] Amendment One was placed on the May 8, 2012 primary ballot in North Carolina.

The measure's proponents repeatedly invoked moral condemnation of and religious opposition to same-sex marriage. State Senator James Forrester explained his support for the amendment because "[t]he Lord intended for a family to have one man and one woman."[5] Another proponent, State Senator Wesley Meredith, argued that "the Bible provides the basis that marriage should be limited to a relationship between a man and a woman."[6] On May 8, 2012, Amendment One passed with 61.04% of the popular vote.[7] Thus, North Carolina law unequivocally bans same-sex marriage.

The second aspect of state law giving rise to this lawsuit is that North Carolina deputizes ordained ministers to solemnize marriages through religious ceremonies that give the marriage legal effect. Such marriage ceremonies occur when a man and woman declare their consent to

---

[4] The vote history of SB 514 is available on the website of the North Carolina General Assembly at http://www.ncga.state.nc.us/gascripts/BillLookUp/BillLookUp.pl?Session=2011&BillID= S514&votesToView=all.

[5] *Wedding Bills*, The News and Observer (Mar. 2, 2011), http://www.newsobserver.com/2011/03/02/1022741/wedding-bills.html.

[6] Paul Woolverton, *N.C. Senate Approves Amendment to Block Gay Marriage*, Fayetteville Observer (Sept. 14, 2011), http://www.fayobserver.com/news/state/article_df7d48cf-1770-5f59-9975-11bc83b05347.html.

[7] The full election results are available on the website of the North Carolina State Board of Elections at http://results.enr.clarityelections.com/NC/36596/85942/en/summary.html.

marry either in the "presence of an ordained minister of any religious denomination" or "a minister authorized by a church," and that minister then declares them "husband and wife." N.C. Gen. Stat. § 51-1(1). A marriage can also occur "[i]n accordance with any mode of solemnization recognized by any religious denomination, or federally or State recognized Indian Nation or Tribe." N.C. Gen. Stat. § 51-1(2). Thus, religious rites have legal as well as ecclesiastical effect.

Third, North Carolina restricts the religious practices of those deputized ministers. It requires for any "marriage ceremony" that the minister must have a license for the marriage of the couple. *See* N.C. Gen. Stat. § 51-6 ("No minister, officer, or any other person authorized to solemnize a marriage under the laws of this State shall perform a ceremony of marriage between a man and woman, or shall declare them to be husband and wife, until there is delivered to that person a license for the marriage of the said persons, signed by the register of deeds of the county in which the marriage license was issued or by a lawful deputy or assistant."). But only a man and woman may obtain that license. *See* Re: Advisory Opinion: Issuance of Marriage Licenses to Individuals of Same Gender; Penalties, N.C. Op. Att'y Gen., 2004 WL 871437, at *2 (2004). And any minister who "marries any couple without a license" commits a Class 1 misdemeanor and, for each such religious ceremony, may be subject to unlimited civil claims, each seeking a $200 levy. N.C. Gen. Stat. § 51-7.

Thus, North Carolina law authorizes the use of religious rites to marry persons of the opposite sex, but threatens criminal sanctions and civil liability to any minister who would solemnize by religious ritual the union of a couple of the same sex.

8

## 2. PLAINTIFFS

Plaintiffs consist of clergy from across faith traditions and their congregants, as well as a religious denomination of more than 1.1 million members, all of whom seek to vindicate fundamental First Amendment rights to the free exercise of their faith and the right to expressive association. Plaintiffs come from different faiths—United Church of Christ, Lutheran (ELCA), Unitarian Universalist, Baptist, and Jewish—but all suffer the same harm: the infringement of religious liberty and expressive association in violation of the First Amendment. All Plaintiffs share the religious belief that same-sex couples can and should have access to religious marriage rites unfettered by state laws threatening prosecution and civil liability for exercising such beliefs.

The "Plaintiff Couples," who are all in loving and committed relationships and wish to marry—Elizabeth "Lisa" Cloninger and Kathleen Smith, Diane Ansley and Cathy McGaughey, Shauna Bragan and Stacy Maloney, Cathy Fry and Joanne Marinaro, Joel Blady and Jeffrey Addy, and Betty Mack and Carol Taylor—suffer an additional harm: the violation of their recognized Fourteenth Amendment rights to marry. For these Plaintiffs, their equal protection and due process rights overcome any purported justification the State of North Carolina might offer to defend Amendment One and the State's Marriage Laws.

### A. The Denominational Plaintiff

Plaintiff the **General Synod of the United Church of Christ** ("General Synod") is the representative body of a Protestant religious denomination consisting of approximately 1.1 million members in more than 5,100 churches around the United States. General Synod Decl. ¶ 3. In North Carolina, the UCC has over 24,000 members and over 400 clergy authorized or affiliated with the UCC worshipping at approximately 155 Local Churches. *Id.* The UCC has a

9

rich heritage of supporting equal rights for all of God's people and robust protection of their right freely to exercise their religious beliefs. *Id.* ¶ 6.

**B. The Clergy Plaintiffs**

The performance of religious marriage ceremonies is a core function and purpose of UCC clergy. As Plaintiff **Reverend Nancy Allison** explains, her role as Senior Pastor at Holy Covenant in Charlotte includes "helping committed couples enter this holy and sacred covenant. In doing so, I help these committed couples become one, fulfill their promises to one another, love and serve God, honor Christ and each other, and rejoice in the power of the Holy Spirit." Allison Decl. ¶ 6. Amendment One and North Carolina's other marriage laws, however, prohibit UCC clergy from performing these critically important religious rites to solemnize the union of same-sex congregant couples without threat of criminal prosecution and civil penalty. *Id.* ¶ 11; Hoffman Decl. ¶ 8; King Decl. ¶ 11. As a result, these UCC pastors are unable to carry out this fundamental and profoundly important function in their respective roles as spiritual leaders of their congregations.

The harmful consequences are many and ongoing. Because of North Carolina's marriage ban, many members of these congregations have been married outside the context of their faith community. As Plaintiff **Reverend Joseph Hoffman** of First Congregational United Church of Christ in Asheville explains: "Consequently, our church community has not been present for these most important ceremonies. I have felt tremendous grief—for the couples and for the congregation—that we have not been able to perform these ceremonies in our church." Hoffman Decl. ¶ 9. Plaintiff **Reverend Nathan King** of Trinity Reformed United Church of Christ in Concord concurs: "[North Carolina's marriage ban] causes a sense of separation from friends and family as well as fellow church members who could normally participate in a wedding more

10

easily and more fully.  Simply put, the ban on marriage equality limits the accessibility of our congregation to share in one another's joy at a supremely significant time in the life of both couple and congregation."  King Decl. ¶ 9.  Reverend Allison is similarly troubled by the burden North Carolina's Marriage Laws place on her ability and the ability of her congregation to "form a faith community of our choosing consistent with the principles of our faith."  Allison Decl. ¶ 13.

Faith leaders from other congregations are similarly burdened and precluded from carrying out a fundamental aspect of their respective religious traditions with respect to a specific segment of their congregations.  For example, Plaintiff **Reverend Nancy Kraft**, an ordained minister in the Evangelical Lutheran Church in America, describes how "[i]t is central" to her role as pastor "to promote and support families."  Kraft Decl. ¶ 8.  According to Reverend Kraft: "The family unit that seeks to be intentional about its faith and religious practice is critically important to continuing the Lutheran faith and our values.  Marriage is an important function in providing stability for any family, whether it includes two committed adults of the same sex or opposite sex."  *Id.*  North Carolina's marriage ban directly infringes upon Reverend Kraft's ecclesiastical duties in practicing her Lutheran faith and its values.  *Id.* ¶¶ 8-9.  Reverend Kraft further understands that, based on North Carolina's marriage laws, solemnizing the same-sex relationships of her congregants exposes her to possible criminal prosecution and civil penalty. *Id.* ¶ 9.

Plaintiff **Reverend Robin Tanner** and Plaintiff **Reverend Mark Ward**, both ministers of Unitarian Universalist congregations, express comparable harms when describing how North Carolina's marriage ban directly infringes upon their ability to lead their respective congregations.  Reverend Tanner is unable to fulfill her pastoral duties at Piedmont Unitarian

Universalist Church in Charlotte because she cannot solemnize committed relationships of two people of the same sex within her church. Tanner Decl. ¶ 8. Reverend Ward of the Unitarian Universalist Congregation of Asheville concurs: "I firmly believe that my deepest faith and my pastoral role at the Unitarian Universalist Congregation of Asheville includes solemnizing the committed relationship of any couple in the church, whether they are of the same sex or of the opposite sex." Ward Decl. ¶ 13.

Both Reverend Tanner and Reverend Ward further understand that based on North Carolina's marriage laws, solemnizing same-sex relationships of their congregants exposes them to possible criminal prosecution and civil penalty. Tanner Decl. ¶ 9; Ward Decl. ¶ 12. Ward stresses that North Carolina law as currently fashioned "impedes the development of the spiritual community in a church like the Unitarian Universalist Congregation of Asheville." Ward Decl. ¶ 13.

Plaintiff **Rabbi Jonathan Freirich**, who practices in accordance with Judaism's Reform and Reconstructionist movements, attests that North Carolina's ban on same sex marriage prevents him from "discharg[ing] [his] responsibilities as a rabbi who helps create families." Freirich Decl. ¶ 8. Consequently, Rabbi Freirich is prevented from carrying out his rabbinical duties: "Assisting couples receive the official sanction of their faith communities helps promote healthy communal structures, stable families, a welcoming and inclusive religious community, and faith in God. Indeed, promoting the creation and stability of Jewish family units is crucial to transmitting and continuing the Jewish faith and values. Inclusion of same-sex couples and families is crucial to transmitting and continuing these Jewish values. Without the ability to exercise my responsibility to assist in marrying all those in our congregations, the State has hindered my ability to fulfill my role as a rabbi." *Id.* ¶ 8. Rabbi Freirich further understands that

based on North Carolina's marriage laws, solemnizing same-sex relationships of his congregants exposes him to possible criminal prosecution and civil penalty. *Id.* ¶ 9.

Plaintiff **Reverend Nancy Petty** of Pullen Memorial Baptist Church in Raleigh attests that "North Carolina's ban on marriage equality has placed a burden on my ability to minister to all of my congregants as equals. It violates my belief that all people are created equal and that God blesses all of our faithful relationships." Petty Decl. ¶ 9. As the leader of a Baptist congregation that was excluded from the state and Southern Baptist Conventions for openly embracing LGBT persons, she understands the consequences of religious convictions. *Id.* ¶ 6. Reverend Petty further understands that based on North Carolina's marriage laws, solemnizing same-sex relationships of her congregants exposes her to possible criminal prosecution and civil penalty. *Id.* ¶ 9.

### C. The Plaintiff Couples

Amendment One and North Carolina's marriage laws not only infringe on the First Amendment freedoms of religious liberty and expressive association of the UCC and assorted faith leaders and their congregants described above, but they also violate the constitutional rights of the six pairs of committed Plaintiff Couples.

**Elizabeth "Lisa" Cloninger** and **Kathleen Smith** live together in Charlotte. Cloninger Decl. ¶ 1; Smith Decl. ¶ 1. They are in a committed, loving and stable relationship and want their pastor, Reverend Nancy Allison of Holy Covenant United Church of Christ, to officiate their wedding in North Carolina. Cloninger Decl. ¶¶ 5, 7; Smith Decl. ¶¶ 4, 6. Lisa and Kathleen are both very involved at Holy Covenant United Church of Christ, and as practicing Christians they believe strongly in the importance of marriage and declaring their relationship in front of their church, family, friends, and in the eyes of God. Cloninger Decl. ¶¶ 6, 8; Smith

13

Decl. ¶¶ 5, 7. Amendment One and North Carolina's marriage laws not only infringe Lisa and Kathleen's right to practice their faith, but they also discriminate against them based on who they love and wish to marry, which violates their equal protection and due process rights. On April 17, 2014, Lisa and Kathleen went to the Mecklenburg County Register of Deeds and applied for a marriage license. They were denied. Cloninger Decl. ¶ 14; Smith Decl. ¶ 13.

**Kay Diane Ansley** and **Catherine "Cathy" McGaughey** live together in Old Fort, North Carolina and worship at First Congregational United Church of Christ in Asheville. Revered Joseph Hoffman is their pastor. Hoffman Decl. ¶ 10; Ansley Decl. ¶ 9; McGaughey Decl. ¶ 9. Diane and Cathy have been in a committed, loving, and stable relationship since 1999 and want to marry in the same church building where Cathy's parents were married and where her mother was baptized. Ansley Decl. ¶¶ 7, 16; McGaughey Decl. ¶¶ 7, 16. On April 24, 2014, Diane and Cathy went to the McDowell County Register of Deeds and applied for a marriage license. They were denied. Ansley Decl. ¶ 17; McGaughey Decl. ¶ 17.

**Shauna Bragan** and **Stacy Maloney** live together in Concord, North Carolina. Bragan Decl. ¶¶ 1-2; Maloney Decl. ¶¶ 1-2. Stacy is a member of Trinity Reformed United Church of Christ and Shauna, while not member, faithfully attends. Bragan Decl. ¶ 2; Maloney Decl. ¶ 2. Revered Nathan King is their senior pastor. King Decl. ¶ 12; Bragan Decl. ¶¶ 5-6; Maloney Decl. ¶¶ 5-6. Shauna and Stacy are in a committed, loving and stable relationship and want their pastor to officiate their wedding in North Carolina. Bragan Decl. ¶ 7; Maloney Decl. ¶ 7. On April 24, 2014, Shauna and Stacy went to the Cabarrus County Register of Deeds and applied for a marriage license. They were denied. Bragan Decl. ¶ 15; Maloney Decl. ¶ 15.

**Cathy Fry** and **Joanne Marinaro** live together in Huntersville, North Carolina and worship at Holy Trinity Lutheran Church in Charlotte. Fry Decl. ¶¶ 1, 6; Marinaro Decl. ¶¶ 1, 6.

The Reverend Nancy Kraft is their pastor.  Kraft Decl. ¶ 14; Fry Decl. ¶ 7; Marinaro Decl. ¶ 7.

Cathy and Joanne are in a committed, loving and stable relationship and want their pastor to

officiate their wedding in North Carolina.  Fry Decl. ¶ 7; Marinaro Decl. ¶ 7.  On April 23, 2014,

Cathy and Joanne went to the Mecklenburg County Register of Deeds and applied for a marriage

license.  They were denied.  Fry Decl. ¶ 13; Marinaro Decl. ¶ 13.

**Joel Blady** and **Jeffrey Addy** live together in Charlotte, North Carolina.  Blady Decl.

¶ 1; Addy Decl. ¶ 1.  Joel is a member of Temple Beth El, and Jeffrey, while not a member,

faithfully attends.  Blady Decl. ¶ 4; Addy Decl. ¶ 4.  Joel and Jeffrey are in a committed, loving

and stable relationship and want Rabbi Freirich to be able to officiate their wedding in North

Carolina.  Blady Decl. ¶ 6; Addy Decl. ¶ 6; Freirich Decl. ¶ 9.

**Betty Mack** and **Carol Taylor** have been in a committed relationship for over 41 years.

Mack Decl. ¶ 4; Taylor Decl. ¶ 4.  Both in their 70s, Betty and Carol want Reverend Ward to be

able to officiate their wedding in North Carolina.  Mack Decl. ¶ 6; Taylor Decl. ¶ 6.  As Carol

describes their connection with their church and faith community: "It is in this place, with these

people, with this faith leader, that I would consecrate the most important relationship of my life."

Taylor Decl. ¶ 9.  On April 25, 2014, Betty and Carol went to the Buncombe County Register of

Deeds and applied for a marriage license, but the Register of Deeds would not issue them a

license.  Mark Decl. ¶ 11; Taylor Decl. ¶ 11.

The Plaintiff Couples all face economic, familial, emotional, and legal harms from being

denied the equal protection and due process rights to marry in North Carolina.  For example,

during Betty Mack and Carol Taylor's 41 year relationship, Carol has usually been employed by

a large institution that covered her health insurance.  Taylor Decl. ¶ 8.  In contrast, Betty has

been either employed by a small company that did not offer insurance or was self-employed.  *Id.*

Unlike Carol's colleagues whose marriages were recognized by the State, Betty could not join her insurance during those years. *Id.* As Carol explains, "[Betty] had to buy expensive individual insurance, creating a financial burden on our family." *Id*; *see also, e.g.*, Addy Decl. ¶ 5, Blady Decl ¶ 8 (difficulty of estate planning); Cloninger Decl. ¶ 12, Smith Decl. ¶ 11 (cost of health insurance); McGaughey Decl. ¶ 13, Ansley Decl. ¶ 13 (inability to file taxes jointly); Fry Decl. ¶ 12, Marinaro ¶ 12 (stigma); Bragan ¶ 11, Maloney ¶ 11 (complicates child care).

### 3. DEFENDANTS

Defendant **Roy Cooper** is the **Attorney General of North Carolina**. As Attorney General, Defendant Cooper is obligated to appear on behalf of the state in any court or tribunal in any cause or matter, civil or criminal, in which the state may be a party or interested. N.C. Gen. Stat. § 114-2. It is the duty of Defendant Cooper to defend and enforce the laws of North Carolina. In addition, as Attorney General, Defendant Cooper has advised that "a register of deeds would violate North Carolina law in issuing a marriage license to persons of the same gender. If, in issuing such a license, the register of deeds operates in bad faith he may subject himself to [certain civil and criminal] penalties . . . ." Re: Advisory Opinion: Issuance of Marriage Licenses to Individuals of Same Gender; Penalties, N.C. Op. Att'y Gen., 2004 WL 871437, at *2 (Mar. 29, 2004). Defendant Cooper and his successors are sued in their official capacity only.

Defendants **Drew Reisinger, Register of Deeds for Buncombe County**; **Wayne Nixon, Register of Deeds for Cabarrus County**; **Tonia Hampton, Register of Deeds for McDowell County**; **J. David Granberry, Register of Deeds for Mecklenburg County**; and **Laura M. Riddick, Register of Deeds for Wake County** are each entrusted with the authority to carry out

certain laws of the state, including issuing marriage licenses. Defendants Reisinger, Nixon, Hampton, Granberry, Riddick, and their successors, are sued in their official capacity only.

Defendants **Ronald L. Moore, Buncombe County District Attorney**; **Roxann Vaneekhoven, Cabarrus County District Attorney**; **Bradley Greenway, McDowell County District Attorney**; **Andrew Murray, Mecklenburg County District Attorney**; and **Ned Mangum, Wake County District Attorney** are the elected representatives of the state in all criminal matters within those respective counties, with the primary responsibility to prosecute all criminal cases filed in the Superior and District Courts, as well as to advise local enforcement.

Defendants' actions constitute actions under color of law and all Defendants have "some connection with the enforcement of the marriage statutes." *Thigpen v. Cooper*, 739 S.E. 2d 165, 172 (N.C. App. 2013).

## 4. QUESTIONS PRESENTED

(1)    Are Plaintiffs likely to prevail on their claims that the North Carolina laws banning same-sex marriage violate the First and Fourteenth Amendments?

(2)    Will Plaintiffs suffer irreparable injury without preliminary injunctive relief?

(3)    Do Plaintiffs' injuries outweigh any injury to Defendants that would result from the preliminary injunction?

(4)    Is the preliminary injunction in the public interest?

## 5. ARGUMENT

To prevail, a "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008); *WV Ass'n of Club Owners*

*v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009); *Houey v. Carolina First Bank*, 890 F. Supp. 2d 611, 620 (W.D.N.C. 2012).  Plaintiffs meet each of these requirements.

**I.      Plaintiffs Are Likely to Prevail on the Merits**

**A.      North Carolina's Laws Banning Same-Sex Marriage Violate the First Amendment's Free Exercise Clause**

No less than laws that state how, when, and where people may pray, the Marriage Laws violate the First Amendment's Free Exercise Clause because they threaten to proscribe religious practices.  The First Amendment to the United States Constitution provides:  "Congress shall make no law . . . prohibiting the free exercise [of religion] . . . ."  U.S. Const. amend. I.  The Free Exercise Clause applies to the states by incorporation into the Fourteenth Amendment.  *See Cantwell v. State of Connecticut*, 310 U.S. 296, 303 (1940).

A unanimous Supreme Court has affirmed recently the foundational importance of the freedom of churches to make religious decisions.  Under the Free Exercise Clause, the government may not "interfere[ ] with an internal church decision that affects the faith and mission of the church itself." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 132 S.Ct. 694, 707 (2012) (citing *Employment Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 877 (1990)).  By threatening clergy who perform religious marriage ceremonies for same-sex couples, the Marriage Laws infringe upon a "religious group's right to shape its own faith and mission."  *Hosanna-Tabor*, 132 S.Ct. at 706.

In *Hosanna-Tabor*, the U.S. Supreme Court expressly recognized the critical role that clergy play in shaping religious beliefs, emphasizing that "[t]he members of a religious group put their faith in the hands of their ministers."  *Id.* at 706.  Thus, *Hosanna-Tabor* held that a "ministerial exception" prevented application of employment discrimination laws to those hired for religious purposes, lest the government intrude on the church's authority to control who

should perform religious roles and functions, and under what circumstances. *Id.*; *see also*

*Petruska v. Gannon Univ.*, 462 F.3d 294, 306 (3d Cir. 2006) (Free Exercise Clause protects "a

religious institution's right to decide matters of faith, doctrine, and church governance").

The reasoning of *Hosanna-Tabor* applies with the same force here. Threatening clergy

with criminal sanctions and civil liability for solemnizing same-sex marriages -- for blessing

human relationships before God and the faith community that shares certain beliefs about the

importance of that ceremony in their common life -- interferes with "the faith and mission of the

church itself." *Hosanna-Tabor*, 132 S.Ct. at 707. The Clergy Plaintiffs have explained the

critical importance of solemnizing marriages to religious belief and practice:

> The nuclear family is a bedrock of civilization. Assisting couples to receive the
> official sanction of their faith communities helps promote healthy communal
> structures, stable families, a welcoming and inclusive religious community, and
> faith in God. . . .Without the ability to exercise my responsibility to assist in
> marrying all those in our congregations, the State has hindered my ability to fulfill
> my role as a rabbi.

Freirich Decl. ¶ 8; *see also* Allison Decl. ¶ 13 (when a minister solemnizes same-sex

relationships in the eyes of God, they welcome new families into their religions and thereby

"form a faith community of [their] choosing consistent with the principles of [their] faith"). Like

the limits the Free Exercise Clause places on the reach of employment discrimination laws when

a church selects employees for religious roles, the State cannot restrict the internal decisions of a

religious body as to what unions are worthy of blessing before God and inclusion and celebration

in that religious community. That is a decision for that faith community and its clergy to make

without threat or interference from the government.

There is a corollary line of cases that further supports the free exercise claim. It holds

that the core purpose of the Free Exercise Clause is to prevent the government from regulating

religious beliefs or taking sides in religious controversies. *See Employment Div., Dep't of*

19

*Human Res. of Ore. v. Smith*, 494 U.S. 872, 877 (1990). Accordingly, a law is not neutral if one "object or purpose . . . is the suppression of religion or religious conduct." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). The Marriage Laws are not "neutral" because of their impact on religious practice. Since 1996, in response to the emerging prospect of marriage equality in North Carolina, the Legislature has placed such unions into a statutory regime in which clergy are prohibited from performing marriage ceremonies. "There are, of course, many ways of demonstrating that the object or purpose of a law is the suppression of religion or religious conduct," *id.* at 533, including the "real operation" of the challenged laws in relation to any "legitimate concern[s] of government . . . apart from discrimination." *Id.* at 535. Recent federal court decisions have consistently held that there is no legitimate justification for such bans and that they are rooted in discriminatory animus. *See United States v. Windsor*, 133 S.Ct. 2675, 2694 (2013) (noting that the Constitution protects the "moral and sexual choices" of same-sex couples); *Lawrence v. Texas*, 539 U.S. 558, 582-83 (2003); *see also, e.g.*, *Kitchen v. Herbert*, 961 F. Supp. 2d 1181, 1204 (D. Utah 2013), *appeal docketed*, No. 13-4178 (10th Cir. Dec. 20, 2013).

The Marriage Laws prohibit *clergy qua clergy* from performing a marriage ceremony for a same-sex couple. *See* N.C. Gen. Stat § 51-7. On their face, the laws regulate religious practice, telling clergy what relationships they may and may not "solemnize" -- consecrate, sanctify and bless. *Id.* Such threatened sanction of a clergy's decision to sanctify a committed relationship between two consenting adult congregants is tantamount to "governmental regulation of religious beliefs as such." *Smith*, 494 U.S. at 877 (quoting *Sherbert v. Verner*, 374 U.S. 398, 402 (1963)); *see also Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004) ("The Free Exercise Clause forbids any regulation of beliefs as such.") (Alito, J.). As the

Supreme Court has recognized, "many religions recognize marriage as having spiritual significance . . . therefore, the commitment of marriage may be an exercise of religious faith as well as an expression of personal dedication." *Turner v. Safley*, 482 U.S. 78, 96 (1987); *see also* Fredric J. Bold, Jr., Comment, *Vows to Collide: The Burgeoning Conflict Between Religious Institutions and Same-Sex Marriage Antidiscrimination Laws*, 158 U. Pa. L. Rev. 179, 185 (2009) ("Americans have historically conceived of marriage in both law and society as a sacred, religious, and pre-political institution that is the foundation of society"); Douglas Laycock, Afterword, in *Same-Sex Marriage and Religious Liberty* 189, 202-03 (Douglas Laycock et al. eds., 2008) ("Marriage is a religious institution and a religious relationship.").  Through marriage rites, congregations, clergy and individuals wish to affirm their belief in "the importance of marriage and declar[e] [their] relationship in front of [their] church, family, friends, and in the eyes of God."  *See* Fry Decl. ¶ 11; Marinaro Decl. ¶ 11.  Such declarations, affirmations and blessings are precisely the expression of beliefs that are at the core of the First Amendment's protection.  Accordingly, "[t]he government may not . . . punish the expression of religious doctrines it believes to be false" or "lend its power to one or the other side in controversies over religious authority or dogma."  *Smith*, 494 U.S. at 877 (citations omitted).

The clerical declaration and blessing of relationships in front of a church, family, friends, and in the eyes of God is an act of faith into which the government may not intrude, absent a compelling interest and narrowly tailored means.  As explained elsewhere in this brief, North Carolina cannot advance any rational basis for this intrusion whatsoever, let alone a compelling interest.  Accordingly, Plaintiffs are likely to prevail on the merits of their claim that the Marriage Laws violate the Free Exercise Clause of the First Amendment.

21

**B.** **North Carolina's Ban on Religious Marriage Ceremonies Violates Plaintiffs' First Amendment Rights to Expressive Association**

The Marriage Laws violate Plaintiffs' First Amendment rights in another important way—the Laws violate the right of expressive association. The First Amendment freedom of association includes the right to expressive association, meaning the "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 146 (4th Cir. 2009) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984)). Emphasizing the importance of the right to expressive association, the Supreme Court observed that it is "crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas." *Dale*, 530 U.S. at 648.

The debate over Amendment One was rife with evidence of such imposition of majority views on those who express different religious beliefs. North Carolina State Senator James Forrester, a sponsor of Amendment One, explained his rationale for the law: "We need to reach out to them and get them to change their lifestyle back to the one we accept"; "[The City of Asheville, North Carolina is] a cesspool of sin."[8] And his view was decidedly religious. He stated, "The Lord intended for a family to have one man and one woman."[9] Another State Senator, Wesley Meredith, declared that "the Bible provides the basis that marriage should be limited to a relationship between a man and a woman."[10]

---

[8] Rob Schofield, *Anti-gay lawmakers speak their (very troubled) minds*, The Progressive Pulse (Sept. 9, 2011), http://pulse.ncpolicywatch.org/2011/09/09/anti-gay-lawmakers-speak-their-very-troubled-minds.

[9] State Senator James Forrester, Sponsor of Amendment One, *Wedding Bills*, The News and Observer (Mar. 2, 2011), http://www.newsobserver.com/2011/03/02/1022741/wedding-bills.html.

[10] Paul Woolverton, *N.C. Senate Approves Amendment to Block Gay Marriage*, Fay Observer (Sept. 14, 2011), http://www.fayobserver.com/news/state/article_df7d48cf-1770-5f59-9975-11bc83b05347.html.

Case 3:14-cv-00213   Document 5   Filed 04/28/14   Page 29 of 47

The Supreme Court has repeatedly recognized the First Amendment right to expressive association when it comes to religious beliefs. "An individual's freedom to speak, to worship . . . could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Roberts*, 468 U.S. at 622. This right to expressive association is particularly important when "dissident expression" faces "suppression by the majority." *Id.* "Government actions that may unconstitutionally infringe upon this freedom can take a number of forms. Among other things, government may not . . . interfere with the internal organization or affairs of the group . . . ." *Id.* at 623. Such interference may only "be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.*

The Court later refined this analytical framework in *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), where it struck down a state law requiring the Boy Scouts to accept gay scout leaders. Under *Dale*, courts analyze the following three factors to determine if a law violates the First Amendment right to expressive association: (1) "whether the group engages in 'expressive association,'" *id.* at 648; (2) whether the challenged law "significantly affect[s] [a group's] ability to advocate public or private viewpoints," *id.* at 650; and (3) whether "the associational interest in freedom of expression" outweighs the State's interest in the regulation, *id.* Applying this framework here, the Marriage Laws are unconstitutional.

First, Plaintiffs engage in expressive association. In *Dale*, the Supreme Court recognized that the Boy Scouts sought to transmit a system of "values—both expressly and by example" and that it was "indisputable that an association that seeks to transmit such a system of values engages in expressive activity." *Id.* at 650. The desire to "transmit . . . [a] system of values,"

both "expressly and by example," defines the religious beliefs and practices at issue here. For example, the UCC is a church of "extravagant welcome" and marries same-sex couples and includes same-sex couples and their families in the life of the church in the same manner as opposite-sex couples and their families. General Synod Decl. ¶¶ 5, 10. As such, the UCC intentionally expresses and transmits a system of values including the value of treating all of God's children alike. *Id.* ¶ 9.

Thus, under *Dale*, there can be no serious question that Plaintiffs' respective religious organizations are equally engaged in expressing a "system of values," and are also protected. *See also Hosanna-Tabor*, 132 S. Ct. at 706 (noting that while "freedom of association is a right enjoyed by religious and secular groups alike," the First Amendment "gives special solicitude to the rights of religious organizations").

Second, under *Dale*, deputizing clergy to perform opposite-sex marriages while threatening sanctions for solemnizing same-sex unions "significantly affect[s]" Plaintiffs' ability to express their views. 530 U.S. at 650. The religious ceremony "is a public affirmation of the marriage in the context of their church and faith. This expression of faith and public affirmation of love, in the strong view of the UCC, has the identical religious significance whether the couple is same sex or opposite sex." General Synod Decl. ¶ 11. Prohibiting clergy from performing such ceremonies "significantly affects" the ability of both the Clergy Plaintiffs and the Couple Plaintiffs to express their core values. *See, e.g.*, Blady Decl. ¶ 6; Tanner Decl. ¶ 7.

Indeed, there is little distinction between forced exclusion versus forced inclusion: Prohibiting religious organizations from performing religious same-sex marriage ceremonies forces them to perform only opposite-sex marriages, projecting the view that only those are legitimate. *See Dale*, 530 U.S. at 654 (state law forcing Boy Scouts to accept a gay individual

"as an assistant scoutmaster would just as surely interfere with the Boy Scouts' choice not to propound a point of view contrary to its beliefs"); *see also Hurley v. Irish-Am. Gay Grp. of Boston*, 515 U.S. 557, 572-73 (1995) (citing *Roberts* and holding that organizers may exclude gay rights organization from St. Patrick's Day parade because state "may not compel affirmance of a belief with which the speaker disagrees").

Third, there is no compelling state justification for the burden the Marriage Laws place on Plaintiffs' First Amendment rights. *Dale*, 530 U.S. at 658-59; *Roberts*, 468 U.S. at 623. As explained more fully below, there is no legitimate governmental justification for the Marriage Laws -- whether they were enacted to espouse some purported societal benefit (*e.g.*, so-called responsible procreation, "optimal" child rearing, or a notion of the "tradition" of marriage), or out of animus against same-sex couples (which is impermissible under the Due Process and Equal Protection Clauses), or to advance a particular group's religious views (which is impermissible under the First Amendment). *See United States v. Windsor*, 133 S.Ct. 2675, 2694 (2013) (noting that the Constitution protects the "moral and sexual choices" of same-sex couples); *Lawrence v. Texas*, 539 U.S. 558, 582-83 (2003); *see also Kitchen v. Herbert*, 961 F. Supp. 2d 1181, 1204 (D. Utah 2013). Thus, although heightened scrutiny should apply to the Marriage Laws, it is clear that the Laws do not even withstand review under the rational basis test.

The Supreme Court was careful to preserve the freedom of religious association even as it rejected a Free Exercise challenge in *Smith*: "[I]t is easy to envision a case in which a challenge on freedom of association grounds would . . . be reinforced by Free Exercise Clause concerns." 494 U.S. at 882 (citing *Roberts*, 468 U.S. at 622). The scope and meaning of such "hybrid rights" has been heavily debated, but the Supreme Court's example was no artificial

Case 3:14-cv-00213   Document 5   Filed 04/28/14   Page 32 of 47

combination of unrelated rights. The Court simply recognized in *Smith* that two closely related rights genuinely "reinforce" each other. The right to determine who may be married in a religious ceremony lies at the intersection of the Free Exercise Clause and the freedom of association.

### C. North Carolina's Laws Banning Same-Sex Marriage Violate the Due Process Clause of the Fourteenth Amendment

The Due Process Clause of the Fourteenth Amendment to the United States Constitution declares that no state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Due process encompasses "matters of substantive law as well as matters of procedure. Thus all fundamental rights comprised within the term liberty are protected by the Federal constitution from invasion by the States." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846-47 (1992) (quoting *Whitney v. California*, 274 U.S. 357, 373 (1927) (Brandeis J., concurring)) (internal quotation marks omitted).

The right to marry is a fundamental right protected by the Due Process Clause. *See, e.g.*, *Turner v. Safley*, 482 U.S. 78, 95 (1987) ("The decision to marry is a fundamental right"); *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978) ("[D]ecisions of this Court confirm that the right to marry is of fundamental importance for all individuals."). The Due Process Clause protects the right to marry because it "has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men." *Loving v. Virginia*, 388 U.S. 1, 12 (1967); *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) (citing *Boddie v. Connecticut*, 401 U.S. 371, 376 (1971)) (noting that choices about marriage, family life, and children upbringing are among the association rights the Court considers sheltered by the Fourteenth Amendment); *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965) (noting that marriage involves "a right of

privacy older than the Bill of Rights" and is a "coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred").

In recent decisions, the Supreme Court has held that same-sex couples have the same protected liberty and privacy interests in their relationships as opposite-sex couples. In *Lawrence v. Texas*, the Court struck down a Texas statute criminalizing acts of sodomy conducted between consenting homosexual adults in their own homes. 539 U.S. 558 (2003). The Court explained that "our laws and tradition afford constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education." *Id.* at 574. The Court held that "[p]ersons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do." *Id.*

The Court applied similar reasoning in its recent decision in *United States v. Windsor*, 133 S.Ct. 2675, 2693 (2013). *Windsor* struck down Section 3 of the Defense of Marriage Act ("DOMA")—defining marriage as between one man and one woman for the purposes of federal law—as violative of "basic due process and equal protection principles." *Id.* at 2693. The Court explained that DOMA's restriction of marriage to heterosexual couples constituted "interference with the equal dignity of same-sex marriages." *Id.* The Court continued:

> DOMA undermines both the public and private significance of state-sanctioned same-sex marriages; for it tells those couples, and all the world, that their otherwise valid marriages are unworthy of federal recognition. This places same-sex couples in an unstable position of being in a second-tier marriage. The differentiation demeans the couple, whose moral and sexual choices the Constitution protects, *see Lawrence,* 539 U.S. 558, 123 S.Ct. 2472 . . . ."

*Id.* at 2694.

In light of the Supreme Court's longstanding holding that marriage is a fundamental right under the Due Process Clause and its more recent holding that a federal law limiting marriage to heterosexual couples violates the "equal dignity of same-sex marriages," *id.* at 2693, it is clear

27

that same-sex marriage is included in the fundamental right to marriage. State laws restricting marriage to opposite-sex couples thus impermissibly infringe upon the due process rights of same-sex individuals to marry the partner of their choosing. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 620 (1984) ("[T]he Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse . . . .").

Indeed, since the *Windsor* decision, three federal district courts have held that the Due Process Clause protects the right of same-sex couples to marry. *See De Leon v. Perry*, No. SA-13-CA-00982-OLG, 2014 WL 715741, at *20 (W.D. Tex. Feb. 26, 2014) ("By denying Plaintiffs . . . the fundamental right to marry, Texas denies their relationship the same status and dignity afforded to citizens who are permitted to marry. It also denies them the legal, social, and financial benefits of marriage that opposite-sex couples enjoy."); *Bostic v. Rainey*, No. 2:13CV395, 2014 WL 561978, at *12 (E.D. Va. Feb. 13, 2014) ("These laws limit the fundamental right to marry to only those Virginia citizens willing to choose a member of the opposite gender for a spouse. These laws interject profound government interference into one of the most personal choices a person makes. Such interference compels careful judicial examination . . . ."); *Kitchen v. Herbert*, 961 F. Supp. 2d 1181, 1204 (D. Utah 2013) ("Plaintiffs have a fundamental right to marry that protects their choice of a same-sex partner."); *cf. Obergefell v. Wymyslo*, 962 F. Supp. 2d 968, 978 (S.D. Ohio 2013) ("*The right to remain married* is therefore properly recognized as one that is a fundamental liberty interest appropriately protected by the Due Process Clause of the United States Constitution. Here, Ohio's marriage recognition bans violate this fundamental right. . . .") (emphasis in original). Since *Windsor*, no court has held otherwise, and this Court should not either.

Because the Marriage Laws infringe upon the fundamental right of same-sex couples to marry, those laws are subject to strict scrutiny by this Court and can only be upheld if they are "narrowly tailored to serve a compelling state interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (quoting *Reno v. Flores*, 507 US 292, 302 (1993)). As explained below, Defendants cannot satisfy their burden of proving that the Marriage Laws satisfy rational basis review, let alone strict scrutiny. For these reasons, the Plaintiff Couples are likely to prevail on the merits of their claim that North Carolina's marriage laws violate the Due Process Clause.

### D. North Carolina's Laws Banning Same-Sex Marriage Violate the Equal Protection Clause of the Fourteenth Amendment

The Equal Protection Clause of the Fourteenth Amendment "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).

In recent months, since the Supreme Court's decision in *Windsor*, six federal district courts, including one in the Fourth Circuit, have found that the laws of six different states prohibiting same-sex marriage that are virtually identical to the North Carolina marriage laws violate the Fourteenth Amendment's Equal Protection Clause.[11] No court since *Windsor* has found that the prohibition against same-sex marriage can withstand Equal Protection scrutiny,

---

[11] Those states are Michigan, Texas, Virginia, Kentucky, Oklahoma, and Utah. *See DeBoer v. Snyder*, No. 12–CV–10285, 2014 WL 1100794 (E.D. Mich. Mar. 21, 2014), *appeal docketed*, No. 14-1341 (6th Cir. Mar. 21, 2014); *De Leon v. Perry*, No. SA–13–CV–00982–OLG, 2014 WL 715741 (W.D. Tex. Feb. 26, 2014), *appeal docketed*, No. 14-50196 (5th Cir. Mar. 1, 2014); *Bostic v. Rainey*, No. 2:13cv395, 2014 WL 561978 (E.D. Va. Feb. 14, 2014), *appeal docketed*, No. 14-1169 (4th Cir. Feb. 25, 2014); *Bourke v. Beshear*, No. 3:13–CV–750–H, 2014 WL 556729 (W.D. Ky. Feb. 12, 2014), *appeal docketed*, No. 14-5291 (6th Cir. Mar. 19, 2014); *Bishop v. United States ex rel. Holder*, 962 F. Supp. 2d 1252 (N.D. Okla. 2014), *appeal docketed*, No. 14-5006 (10th Cir. Jan. 27, 2014); *Kitchen v. Herbert*, 961 F. Supp. 2d 1181 (D. Utah 2013), *appeal docketed*, No. 13-4178 (10th Cir. Dec. 20, 2013).

even under rational basis review.  As with DOMA, by refusing to permit same-sex couples to marry and criminalizing acts of clergy that would solemnize such marriages, the Marriage Laws single out a "subset" of relationships and deny same-sex couples the equal rights, responsibilities, and benefits that opposite-sex couples receive, thereby "demean[ing] the couple, whose moral and sexual choices the Constitution protects."  *Windsor*, 133 S.Ct. at 2694 (citing *Lawrence v. Texas*, 539 U.S. 558, 588 (2003)).

Because the Marriage Laws classify citizens on the basis of sexual orientation, this Court should apply strict scrutiny in considering whether they violate constitutional rights.[12]  The Supreme Court consistently has applied heightened scrutiny to laws that discriminate against a group that has experienced a "history of purposeful unequal treatment or ha[s] been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities."  *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (per curiam) (quotations omitted); *see also United States v. Virginia*, 518 U.S. 515, 531 (1996) (noting "long and unfortunate history of sex discrimination").  There can be no serious debate that gays and lesbians, the targets of the Marriage Laws, have experienced a "history of purposeful unequal treatment."  The Supreme Court itself has noted this fact, *see Lawrence*, 539 U.S. at 571 ("for centuries there have been powerful voices to condemn homosexual conduct as immoral"), and federal courts consistently have recognized that "[g]ays and lesbians have been victims of a long

---

[12] Although the Fourth Circuit has held in older cases that discrimination based on sexual orientation is subject to rational basis review, *see Veney v. Wyche*, 293 F.3d 726, 731–32 (4th Cir. 2002); *Thomasson v. Perry*, 80 F.3d 915, 928 (4th Cir. 1996), those decisions were premised on the absence of constitutional protection for same-sex intimate conduct -- a premise that the Supreme Court now has now rejected.  *MacDonald v. Moose*, 710 F.3d 154, 163 (4th Cir. 2013) ("In *Lawrence*, the Supreme Court plainly held that statutes criminalizing private acts of consensual sodomy between adults are inconsistent with the protections of liberty assured by the Due Process Clause of the Fourteenth Amendment.") (citing *Lawrence*, 539 U.S. at 578).  This Court accordingly is free to reexamine whether discrimination based on sexual orientation is subject to heightened scrutiny.  *See Faust v. S.C. State Highway Dep't*, 721 F.2d 934, 936 (4th Cir. 1983) (decisions that have been "sufficiently undermined by subsequent Supreme Court decisions . . . should no longer be followed").

history of discrimination," *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 981 (N.D. Cal. 2010).

*See also Veney*, 293 F.3d at 733-34 ("[W]e cannot ignore the fact that homosexuals are subject to bias-motivated attacks from heterosexuals.").

Heightened scrutiny also applies because the Marriage Laws are premised on sex or gender-based classifications.  It is well established that classifications based on sex can be sustained only where the government demonstrates that they are "substantially related" to an "important governmental objective."  *Virginia*, 518 U.S. at 533 (quotations omitted); *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 682 F.3d 1, 9 (1st Cir. 2012) ("Gender-based classifications invoke intermediate scrutiny and must be substantially related to achieving an important governmental objective.").  The Marriage Laws classify citizens based on their sex because, for example, Plaintiffs Blady and Addy would be able to marry each other in North Carolina if one of them were female, and Plaintiffs Fry and Marinaro would be able to marry each other if one of them were male.  The Equal Protection Clause prohibits such "differential treatment or denial of opportunity" based on a person's sex in the absence of an "exceedingly persuasive" justification.  *Virginia*, 518 U.S. at 532–33 (quotations omitted).

E.     **The Marriage Laws Cannot Withstand Rational Basis Review; The Laws Therefore Fail Under Any Form Of Heightened Scrutiny**

Although strict or at least intermediate scrutiny should apply, it is clear that North Carolina's prohibition against same-sex marriage lacks even a "rational relation to some legitimate end."  *Romer v. Evans*, 517 U.S. 620, 631 (1996).  For this reason, the Marriage Laws necessarily fail under any form of heightened scrutiny as well.

In order to survive rational basis review, the law at issue "must find some footing in the realities of the subject addressed by the legislation."  *Heller v. Doe*, 509 U.S. 312, 321 (1993). The Court must also "ensure that classifications are not drawn for the purpose of disadvantaging

31

the group burdened by the law." *Romer*, 517 U.S. at 633. Further, laws "born of animosity toward the class of persons affected" are invalid under rational basis review. *Id.* at 634.

Here, Defendants cannot identify any rational basis for excluding gay and lesbian individuals from the benefits and responsibilities of marriage. Proponents of similar laws banning same-sex marriage have sought and failed to justify such restrictions under theories that the laws promote an "optimal" childrearing environment or family unit; encourage procreation; rely on the "traditional" definition of marriage; or reflect the state's right to protect "traditional" morality (*i.e.*, moral condemnation of gays and lesbians).

None of these purported justifications can withstand even rational basis review. Indeed, these justifications (and others) have been rejected by each court that has recently considered them.[13] In summary, the justifications fail as follows:

- Any asserted interest in creating an "optimal" child-rearing environment fails because there is no reason to believe (and no evidence to suggest) that prohibiting gays and lesbians from marrying will increase the number of children raised in so-called "optimal" conditions. Indeed, in *DeBoer*, the court concluded after trial and testimony from numerous experts on both sides of the debate that "the evidence adduced at trial disproved th[e] premise" that "heterosexual married

---

[13] *See DeBoer*, 2014 WL 1100794, at *12-16 (rejecting optimal childrearing environment, proceeding with caution into new definitions of marriage, tradition and morality, and the state's interest in defining marriage); *De Leon*, 2014 WL 715741, at *14-17 (rejecting responsible procreation and childrearing, and preserving traditional marriage); *Bostic*, 2014 WL 561978, at *22 (rejecting protecting tradition, responsible procreation, and protecting state's role in domestic laws); *Bourke*, 2014 WL 556729, at *7-8 (rejecting "state's institution of traditional marriage," responsible procreation and childrearing, steering naturally procreative relationships into stable unions, promoting the optimal childrearing environment, and proceeding with caution when considering changes in how the state defines marriage); *Bishop*, 962 F. Supp. 2d at 1288-96 (rejecting responsible procreation and childrearing, steering naturally procreative relationships into stable unions, promoting the ideal family unit, and avoiding changes to the institution of marriage and unintended consequences); *Kitchen*, 961 F. Supp. 2d at 1211-15 (rejecting responsible procreation, optimal childrearing, proceeding with caution); *Obergefell v. Wymyslo*, 962 F. Supp. 2d at 993-94 (rejecting optimal childrearing).

couples provide the optimal environment for raising children." 2014 WL 1100794, at *12. The availability of marriage to gay men and lesbians has no effect on the ability of heterosexual couples to have and raise children. Meanwhile, same-sex marriage bans do great damage to the many thousands of children being raised by gay men and lesbians, including, for example, Shauna Bragan's two children. Maloney Decl. ¶ 2; Bragan Decl. ¶ 2. As even the Supreme Court has noted, laws precluding marriage between same-sex couples "bring financial harm to children of same-sex couples" by "rais[ing] the cost of health care for families by taxing health benefits provided by employers to the workers' same-sex spouses." *Windsor*, 133 S.Ct. at 2695. Laws like North Carolina's that ban same-sex marriage "humiliate[]" children raised by gay and lesbian couples, making it "more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives." *Id.* at 2694. Allowing same-sex couples to marry would benefit -- not harm -- children in North Carolina. *See Perry*, 704 F. Supp. 2d at 963 ("The tangible and intangible benefits of marriage flow to a married couple's children.").

- There also is no rational basis to assert that banning same-sex marriages promotes procreation within a marriage. Whether same-sex couples are permitted to marry has no relationship to or impact on heterosexual couples wishing to marry, or the procreation of those heterosexual couples. In short, "it defies reason to conclude that allowing same-sex couples to marry will diminish the example that married

opposite-sex couples set for their unmarried counterparts." *Kitchen*, 961 F. Supp.
2d, at 1211.

- To the extent North Carolina argues that the Marriage Laws can be justified based
  on a desire to maintain "traditional" definitions of marriage, they are wrong as a
  matter of law and fact. As a legal matter, "tradition" is not a sufficient basis to
  justify a discriminatory law. *Lawrence*, 539 U.S. at 577-78 ("[N]either history
  nor tradition could save a law prohibiting miscegenation from constitutional
  attacks"); *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 733-35 (2003) (state
  discriminatory action based on stereotypes or historical roles was
  unconstitutional). As a factual matter, there is a strong "tradition" of recognizing
  the sanctity of same-sex marriages, as the declarations concurrently submitted
  herewith demonstrate. *See, e.g.*, General Synod Decl. ¶ 9; King Decl. ¶¶ 6-7.

- The Supreme Court also has made clear that "[m]oral disapproval" of gay men
  and lesbians, "like a bare desire to harm the group, is an interest that is
  insufficient to satisfy" even rational basis review. *Lawrence*, 539 U.S. at 582.
  The "law cannot, directly or indirectly, give [private biases] effect" at the expense
  of a disfavored group's fundamental constitutional rights. *Palmore v. Sidoti*, 466
  U.S. 429, 433 (1984); *see also Lawrence*, 539 U.S. at 577 ("[T]he fact that the
  governing majority in a State has traditionally viewed a particular practice as
  immoral is not a sufficient reason for upholding a law prohibiting the practice.")
  (citation omitted) (quotations omitted).

In examining DOMA, the Supreme Court found that "interference with the equal dignity
of same-sex marriages" was the "essence" of the law -- and that the law was unconstitutional for

that reason. *Windsor*, 133 S.Ct. at 2693. As the Court explained, "the avowed purpose and practical effect of the law" was to "impose a disadvantage, a separate status, and so a stigma" upon gay and lesbian relationships, relegating them to an inferior status. *Id*. "The stated purpose of the law was to promote an interest in protecting the traditional moral teachings reflected in heterosexual-only marriage laws." *Id.*; *see also Lawrence*, 539 U.S. at 601 ("'[P]reserving the traditional institution of marriage' is just a kinder way of describing the State's *moral disapproval* of same-sex couples.") (Scalia, J., dissenting) (emphasis in original).

North Carolina's Marriage Laws suffer from the same failings as DOMA and must suffer the same fate. These laws were enacted to "deprive some couples . . . , but not other couples, of both rights and responsibilities," thereby "writ[ing] inequality" into the North Carolina Constitution and statutory code. *Windsor*, 133 S.Ct. at 2694. Under any level of review, they violate the Fourteenth Amendment and should be struck down.

## II.    Plaintiffs Will Suffer Irreparable Injury Without Preliminary Injunctive Relief

Plaintiffs are severely and irreparably injured by the challenged state laws, which violate the First Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The deprivation of constitutional rights constitutes *per se* irreparable harm. *See, e.g.*, *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011) (holding violation of First Amendment constituted *per se* irreparable injury) (quoting *El-rod v. Burns*, 427 U.S. 347, 373 (1976)); *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978). Where, as here, movants establish that they are being denied a constitutional right, preliminary injunctive relief must be granted. *See Henry v. Greenville Airport Comm'n*, 284 F.2d 631, 633 (4th Cir. 1960) (per curiam) (holding that an injunction must be granted where "a person . . . establishes by undisputed evidence that he is being denied a constitutional right.").

The severe and irreparable harm to Plaintiffs if a preliminary injunction is not entered is well documented. Among other things, same-sex couples who wish to marry, but who are barred from doing so by the Marriage Laws, are denied important financial benefits that are automatically conferred on married couples including the ability to automatically inherit a partner's estate. *See, e.g.*, Taylor Decl. ¶ 7. Same-sex couples must instead hire lawyers to draft a will to achieve what the law automatically bestows on opposite-sex couples who are allowed to marry. *Id.* As a result of their status, same-sex couples also suffer financial penalties that do not apply to opposite-sex couples who are entitled to marry. For example, married couples may deduct the cost of including a spouse on an employer sponsored health insurance plan; same-sex couples are not entitled to this benefit. *See, e.g.*, Cloninger Decl. ¶ 12. Same-sex couples also are "unable to take advantage of the spousal exception on inheritance and must pay an inheritance tax on jointly-owned property." Fry Decl. ¶ 8. Apart from these financial costs, the Marriage Laws stigmatize and demean the relationships and religious beliefs of same-sex couples who wish to marry; they are made to feel like "second-class citizens." Ansley Decl. ¶ 15; McGaughey Decl. ¶ 15; Smith Decl. ¶ 12; Bragan Decl. ¶ 13; Maloney Decl. ¶ 13; Marinaro Decl. ¶ 12; Blady Decl. ¶ 11; Addy Decl. ¶ 10; Cloninger Decl. ¶ 13; Fry Decl. ¶ 12; Taylor Decl. ¶ 10; Mack Decl. ¶ 10. Critically, the Marriage Laws also compromise the ability of same-sex couples to care for their children in the event of an emergency because they effectively bar a putative spouse from becoming recognized as a legal parent. *See, e.g.*, Fry Decl. ¶ 9.

Clergy Plaintiffs face similar harms arising from the Marriage Laws. For example, Reverend Allison "fear[s] that performing religious rites that solemnize the union of same-sex couples violates the law and exposes [her] to criminal prosecution and financial judgments."

36

Allison Decl. ¶ 11.  As a result, the Marriage Laws have a "chilling effect," preventing her from "solemnizing same-sex marriages on an equal basis with opposite-sex marriages."[14]  *Id.*; *see also* Hoffman Decl. ¶ 10; King Decl. ¶ 11; Kraft Decl. ¶ 9; Freirich Decl. ¶ 9;  Tanner Decl. ¶ 9; Ward ¶ 14; Petty Decl. ¶ 9.

### F.    The Balance of the Equities Favors Plaintiffs.

Defendants cannot seriously claim that a preliminary injunction would cause harm to them or to the State of North Carolina.  Indeed, the Fourth Circuit has found that "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional.  If anything, the system is improved by such an injunction."  *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013).

The State already has in place the necessary infrastructure to grant marriage licenses and effect any other administrative requirements already in place for opposite-sex couples.  The balance of harms favors Plaintiffs because, without an injunction, they will not only be deprived of their constitutional rights, but same-sex couples will be deprived of the many benefits and rights afforded to married couples.  These include the basic, fundamental rights of exercise of religion, freedom of association, due process, and equal protection, as well as more specific benefits and rights attendant to marriage, including health insurance benefits, childcare benefits, and favorable treatment on income and estate taxes prescribed by state law as well as the basic respect and dignity afforded to legally married couples.  Individual Plaintiffs also cannot

---

[14] While none of the Clergy Plaintiffs have been prosecuted for previously performing same sex-marriage ceremonies, the Marriage Laws nevertheless have a chilling effect on their willingness to perform such ceremonies on an equal basis as for opposite-sex couples.  Furthermore, the Fourth Circuit has held that even absent prosecution, unless the State "disclaim[s] any intention of exercising [its] enforcement authority," the injury persists.  *Mobil Oil v. Attorney General of Com. of VA*, 940 F.2d 73, 76 (4th Cir. 1991) ("We see no reason to assume that the [State] legislature enacted this statute without intending it to be enforced.").

currently claim benefits under various federal laws that apply only to married couples because they cannot marry under North Carolina law. These Plaintiffs' injuries will be redressed only if this Court declares these provisions unconstitutional and enjoins Defendants from enforcing them.

### G. A Preliminary Injunction Is In The Public Interest

The Fourth Circuit has found that "upholding constitutional rights surely serves the public interest." *Centro Tepeyac*, 722 F.3d at 191; *see also Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (finding that "upholding constitutional rights serves the public interest"); *Saint v. Neb. Sch. Activities Ass'n*, 684 F. Supp. 626, 630 (D. Neb. 1988) (finding "the public interest will be served by the granting of the [injunction] as the plaintiff is seeking to prevent violations of [its] constitutional rights"). A preliminary injunction would ensure that the Plaintiff Couples are afforded the same constitutional rights and protections currently shared by opposite-sex couples. Ensuring the constitutional rights of all citizens is surely in the public interest.

### 6. CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for preliminary injunction.

Dated: April 28, 2014

Respectfully submitted,

Jonathan S. Martel
David J. Weiner
Samuel Witten
Sarah E. Warlick
Thomas A. Glazer
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
Phone: (202) 942-5470
Fax: (202) 942-5999
Email: jonathan.martel@aporter.com
*Pro Hac Vice Applications Pending*

Sean Morris
Arnold & Porter LLP
777 South Figueroa St.
Los Angeles, CA 90017
Phone: (213) 243-4222
Email: sean.morris@aporter.com
*Pro Hac Vice Application Pending*

/s/ S. Luke Largess
S. Luke Largess
/s/ Jacob H. Sussman
Jacob Sussman
/s/ John W. Gresham
John W. Gresham
Tin Fulton Walker & Owen
301 East Park Avenue
Charlotte, NC 28203
Phone: (704) 338-1220
Fax: (704) 338-1312
Email: llargess@tinfulton.com
Email: jsussman@tinfulton.com
Email: jgresham@tinfulton.com

Mark Kleinschmidt
Tin Fulton Walker & Owen
312 West Franklin Street
Chapel Hill NC 27516
Phone: (919) 240-7089
Fax: (919) 240-7822
Email: mkleinschmidt@tinfulton.com

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Jacob H. Sussman
Jacob Sussman
Tin Fulton Walker & Owen
301 East Park Avenue
Charlotte, NC 28203
Phone:  (704) 338-1220
Fax: (704) 338-1312
Email: jsussman@tinfulton.com

40